Ross BURK, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff) (Two Cases).

Nos. 92–36, 92–37.

Supreme Court of Wyoming.

March 10, 1993.

**226**

Kathleen Audette Rideout, Casper, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen. and Barbara L. Boyer, Sr. Asst. Atty. Gen., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

GOLDEN, Justice.

This is a consolidated appeal from two separate bench trials in which appellant Ross Burk was found guilty of two counts of burglary and one count each of aggravated robbery, conspiracy to commit aggravated robbery, and conspiracy to commit burglary. Appellant raises issues concerning the voluntariness of inculpatory statements he made to police while in custody, the sufficiency of the evidence to support the conviction of conspiracy to commit aggravated robbery, the appropriateness of the sentences he received, the failure of one of the trial judges to disqualify himself before trial, and police conduct which allegedly resulted in a denial of effective assistance of counsel.

We shall affirm.

Appellant stated the issues in this way: 1. Are statements made to law enforcement officials admissible when a waiver of constitutional rights was obtained under the circumstances that the confessor

* Retired January 1, 1993.

had been kidnapped and severely beaten and injured, deprived of sleep for an extended period, and had been assured by police officers and a district attorney that he was being questioned solely as a victim and not as a suspect, and where the confessor was deprived of counsel after request and denied access to a telephone until after he had signed the waiver?

2. Is physical evidence admissible when it is obtained under the circumstances that the confessor's wife is taken by police officers to pick such evidence up after having been misled as to the confessor's status as a victim?

3. Is physical evidence admissible when it is obtained from private individuals who obtained such property by commission of crimes and who kidnapped and severely beat and held the accused in handcuffs and shackles for eleven hours to obtain admittedly involuntary statements?

4. Is evidence (including statements of codefendants) obtained as the result of involuntary statements and an unknowing waiver of constitutional rights (including consents to search) admissible?

5. Was the evidence sufficient to convict appellant of conspiracy to commit armed robbery?

6. Was it abuse of discretion for the trial courts to fail to consider probation, and were the sentences inherently unfair compared with other defendants' sentences?

7. Was appellant deprived of due process by Judge Spangler's refusal to disqualify himself?

8. Was appellant denied effective assistance of counsel when the police officer misrepresented to his attorney that he was not a suspect, causing his attorney to improperly advise appellant concerning making a statement?

The state rephrased the issues to be:

I. Were appellant's statements to the police made knowingly, intelligently and voluntarily?

II. Was appellant's conviction of conspiracy to commit aggravated robbery based upon sufficient evidence?

III. Did appellant receive an appropriate sentence for the crimes he committed?

IV. Did Judge Spangler properly deny appellant's motion to disqualify himself from appellant's case?

V. Was appellant denied effective assistance of counsel?

## FACTS

Appellant, age 27, married, and self-employed as a motor vehicle and body shop mechanic, arose at 6:30 a.m. on August 21, 1990, to begin his normal work-day. That day he and Mark Timmerman were working on the transmission of Timmerman's truck. Around 1:30 p.m. John E. Kunckel and three of his friends stormed into appellant's shop. They seized appellant and Mr. Timmerman, placed handcuffs and leg shackles on them, and began interrogating appellant about his participation in the theft of property owned by Kunckel and one of his companions. Timmerman described the first ten minutes of this encounter as "pretty intense." He stated appellant was hit in the face or eye with a closed fist, hit across his chest several times with a two-pound sledge hammer, and at one time placed in a choke-hold that caused appellant to complain that he was getting light-headed and was going to faint.

Kunckel and his companions held appellant and Timmerman captive until around 1:00 a.m., August 22, 1990. During this almost twelve-hour period of time, Kunckel extracted from appellant admissions that he was guilty of the crimes of which Kunckel accused him. Also, appellant helped Kunckel and his companions recover some of the property involved.

Late on the night of August 21, 1990, Kunckel called the Casper Police Department, reported that he had captured the fellow who had stolen his property, and asked the police to come to the location where he was holding appellant. Several members of the police department soon arrived and Kunckel released appellant to

them. Detective Pat Burgen placed handcuffs on appellant, who was then taken to the police department by another officer. Detective Burgen stayed with Kunckel for a short period of time, gathering information that Kunckel had developed during the time he held appellant.

After returning to the police department detective Burgen met with appellant in the interview room at about 1:30 a.m., August 22, 1990. Detective Burgen saw that appellant's lip was cut and swollen, his eye was red and the cheek under it had a "mouse," his shirt was torn, and his chest was swollen and discolored red and purple. Where Kunckel's handcuffs had been, appellant's wrists were red and swollen.

Detective Burgen asked appellant what happened. According to Burgen, appellant "related a slight, brief story" that he had been abducted from his shop, had been beaten, had been handcuffed and shackled; his wrists hurt and chest hurt, he was having difficulty breathing, and he wanted to see a doctor. Detective Burgen and police officer Kirkendale immediately took appellant to the hospital emergency room for medical attention. Burgen testified at trial that he asked Kirkendale to call Burk's wife, Jill, around 1:30 a.m. She testified at the suppression hearing that she received Kirkendale's call around 1:30 a.m., telling her Burk was being questioned at the police department.

At the hospital emergency room, Dr. Michael Bruno examined appellant. Dr. Bruno's initial medical assessment was that appellant appeared to be stable and did not require hospitalization for his injuries. From his examination of and the history he obtained from appellant, Dr. Bruno noted contusions of the left temple and maxillar region, complaint of facial pain, and "left-sided and rib pain." According to the doctor, appellant did not indicate he was unable to breath; further, he considered appellant to be alert and oriented with no impairment of his mental abilities. As a standard precautionary measure, Dr. Bruno issued to detective Burgen, a head injury sheet with specific injury signs to watch for. Dr. Bruno explained these instructions are issued whenever hospitalization is unnecessary, but the patient presents with the potential for head injury or facial contusions.

Detective Burgen and appellant left the hospital emergency room and returned to the police department by about 3:30 a.m. In the interview room they were joined by police officer DeGraw. After a brief conversation among appellant and these officers, which we shall examine closely later, detective Burgen took appellant to the jail for booking. Around 4:00 a.m., appellant, now wearing distinctive jail clothing, was placed in a cell.

Jill Burk testified that she called the police department at 6:00 a.m. and was told Burk was being held under suspicion of burglary. She then called appellant's father, John Burk, an attorney. Around 8:00 a.m., detective Burgen and officer DeGraw met with assistant district attorney Pat Crank in the latter's office to discuss appellant's situation. Detective Burgen related to Crank the information he had received several hours earlier from Kunckel. Crank decided he should talk to appellant. Detective Burgen arranged to have appellant taken from his jail cell to the police department conference room.

Around 8:50 a.m., August 22, 1990, Crank, detective Burgen and officer DeGraw met with appellant in the conference room. According to Crank, he told appellant he needed his cooperation to get the persons who had abducted and beat him. Crank observed that appellant was incredibly remorseful. Burgen, DeGraw and Crank found appellant to be alert. According to DeGraw, appellant was fine, appeared eager to talk, and did not complain about his physical condition. According to Crank and the officers, appellant stated he had screwed up his life, needed to get some things off his chest, needed to go to the pen and get his life back in order. Crank stated he told appellant that if the latter felt he needed to get some things off his chest then he should be completely truthful with the police. Crank further stated he made no promises that whatever appellant told the police would not later be used

against him. Crank returned to his office, while Burgen and DeGraw remained with appellant.

There is no dispute that at this point detective Burgen and officer DeGraw then advised appellant of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). After determining that appellant wished to waive these rights, the officers presented him with a waiver of rights form to execute, which he did. The officers then began interrogating appellant, and appellant began making inculpatory statements.

Before the officers tape recorded appellant's statements, they received word that appellant's father, John Burk, was in the building and had requested to see his son. Detective Burgen met appellant's father and walked with him to the conference room. After entering the conference room where his son and officer DeGraw were, John Burk asked what was going on. DeGraw told him that his son had taken some property from some people, and these same persons had abducted, handcuffed, and beat him. DeGraw also told him the police needed to get a statement from appellant. According to DeGraw, appellant's father did not ask that his son have legal representation and made no requests to stop the interview. DeGraw described the conversation with appellant's father as "very short"; at its conclusion, appellant's father handed his business card to the officer and left the room. The business card revealed that he was an attorney.

After appellant's father left, the officers resumed their questioning of appellant. At noon, appellant made a telephone call to his wife, and she indicated she would visit him when she got off work later that day. She came to the police department later that day, ate supper with appellant, and visited alone with him. At this time, appellant told her to sign a consent-to-search form and cooperate with the police in recovering various items of stolen property. She followed appellant's directions.

During the evening of August 22, 1990, officer Kevin Reed talked to appellant and learned of his involvement in a burglary of another business and an aggravated robbery. Officer Reed orally advised appellant of the *Miranda* warnings and appellant made inculpatory statements about these additional criminal episodes. Following the last statement given by appellant, the police released him from custody around 11:00 p.m.

The next day, detective Burgen and others met appellant at his body shop to retrieve additional stolen property, at which time appellant signed yet another consent-to-search form.

On September 10, 1990, the district attorney filed the criminal charges which are the subject of this appeal. In D.Ct. No. 11233, the charge was one count of burglary; in D.Ct. No. 11235, the charges were one count each of burglary, conspiracy to commit burglary, aggravated robbery, and conspiracy to commit aggravated robbery. In both cases appellant filed motions to suppress the inculpatory statements made by appellant while in custody and before the initiation of criminal proceedings. In D.Ct. No. 11235, the trial judge held a hearing on the suppression motion filed in that case. After hearing testimony from both prosecution and defense witnesses, the trial judge found that appellant had made voluntary statements after having been properly advised of his constitutional rights and after having made a knowing, intelligent, and voluntary waiver of those rights. The trial judge held, therefore, that appellant's statements were admissible as evidence at the trial.

Two bench trials were held with different judges presiding. In D.Ct. No. 11233, although the trial judge held no pretrial hearing on the motion to suppress, he was apprised of the ruling in D.Ct. No. 11235. During the course of the trial in D.Ct. No. 11233, the trial judge found that appellant had voluntarily made the questioned statements after proper advice of rights and knowing, intelligent, and voluntary waiver. He, too, held the statements were admissible as evidence in that trial.

Appellant was found guilty as charged in the respective trials. In D.Ct. No. 11233,

the judge sentenced appellant to not less than two nor more than four years in the state penitentiary to run concurrent with the sentence imposed in D.Ct. No. 11235. In D.Ct. No. 11235, the judge sentenced appellant to two terms of seven to ten years for aggravated robbery and conspiracy to commit aggravated robbery, to be served consecutively, and to two terms of one-to-two years for burglary and conspiracy to commit burglary, to be served concurrently as to those two counts but consecutively as to the seven to ten year sentence.

Appellant timely filed his appeal.

## DISCUSSION

Against a *detailed* factual background, this court will consider appellant's claim that his statements were obtained in violation of his constitutional rights and, consequently, that the statements were erroneously admitted into evidence at both bench trials. This factual background will focus on appellant's being in police custody while he made several inculpatory statements and consented to several warrantless searches of places under his control.

1. *Voluntariness of Appellant's Inculpatory Statements.*

█ Appellant claims that his inculpatory statements were induced by promises variously made by detective Burgen, officer DeGraw and assistant district attorney Crank that they viewed him as a victim of Kunckel's criminal activity; that his statements were solely for the purpose of preparing the cases against Kunckel and his cohorts; and that as soon as he made such statements, the police would release him. We recognize that "[a] confession is not voluntary—if extracted by threats or improper influences or promises." *Garcia v. State*, 777 P.2d 603, 606 (Wyo.1989). Appellant identifies three specific occasions during his custody where the law enforcement agents made some or all of these representations to him.

Appellant testified that when he returned to the police department around 3:30 a.m., after receiving medical treatment at the hospital emergency room, detective Burgen and officer McGraw tried to question him. Disputes of fact existed between appellant's version and the officers' version of this encounter. According to appellant, the officers wanted to know about the Kunckel burglary, and that is when he told them he wanted an attorney. Continuing, appellant stated officer DeGraw asked that he tell them about Kunckel's abducting and beating him; appellant told them he did not want to say anything.

According to detective Burgen, when he returned to the police department around 1:30 a.m. to meet with appellant before taking him to the hospital, he asked him what had happened. Appellant told him briefly about his abduction and beating and asked to see a doctor.

After the trip to the hospital and back, detective Burgen and officer DeGraw again talked to appellant. According to Burgen, they again asked him what had happened, telling him if he was a crime victim then he would have to tell them about it. They asked him about the name of "Mark Timmerman," a witness who might help them in their investigation. Appellant acknowledged that Timmerman had been present, but then stated he wanted to go to bed. At this point, DeGraw told appellant that, based on the information they had at that time, he was the perpetrator of a burglary and he was not going home, but to jail. Appellant replied that he would go to jail, get some sleep, and talk to them the next morning. Detective Burgen then took appellant for processing to be jailed.

The second occasion during which appellant alleges promises were made to him occurred around 8:50 a.m., four hours after he was placed in jail. On this occasion appellant was in the police department conference room in the presence of detective Burgen, officer DeGraw, and assistant district attorney Crank. Disputes of fact exist between appellant's version of this questioning and the version given by the law enforcement agents. According to appellant, Crank told him they were talking to him as a victim and needed his help in bringing his abductors to justice, after which they would "cut him loose." Crank

stated he did initiate the conversation by telling appellant he was a crime victim whose help they needed to solve that crime. It was at this time that appellant, whose demeanor was "incredibly remorseful," voluntarily told them that he had screwed up his life, needed to get some things off his chest, needed to go to the penitentiary, and needed to get his life back in order. Crank claims he then told appellant that if he felt he needed to get some things off his chest, he should be completely truthful with the police. According to Crank, he made no promises to appellant that the police would not use his statements against him; he did not remember telling appellant he would "cut him loose" if appellant cooperated.

In sum, the assistant district attorney asserted that he only asked appellant questions about his injuries, and Kunckel's abduction and beating, but none about appellant's alleged criminal activities. The testimony of detective Burgen and officer DeGraw was substantially similar to that of the assistant district attorney.

The third occasion on which appellant claims that the law enforcement agents made promises to him occurred during the questioning done by detective Burgen and officer DeGraw after the assistant district attorney had left the conference room. It was on this last occasion that appellant's father, an attorney, was present. Once again, disputes of fact existed between the version told by appellant and his father and the version given by officer DeGraw. According to appellant and his father, when the latter entered the conference room where appellant and officer DeGraw were talking, the father asked what had happened and whether appellant needed him there. Appellant and his father both stated that officer Burgen answered that appellant was being questioned strictly as a victim. Interestingly, however, appellant's father also testified that when officer DeGraw "[t]old me what happened. I realized [my son] was in trouble over the Kunckel theft * * *." Appellant's father further testified that he had taught appellant from his childhood about his constitutional rights, asserting, "My kids could read the *Miranda* ruling at the age of 10." He

stated that appellant had been brought up in the house of a prosecutor and that as appellant's father he had explained the *Miranda* ruling to appellant and his other children "over the dinner table." Moreover, appellant's father acknowledged that on past occasions his son had been involved in criminal proceedings and never gave a statement to the authorities outside his father's presence.

Officer DeGraw testified he told appellant's father that appellant had stolen property from the persons who beat him up and he [officer DeGraw] needed to get a statement from him. Further, officer DeGraw testified that appellant's father made no comment about legal representation for appellant and made no request that the interview be stopped.

And, finally, according to the state's witnesses, when they questioned appellant beginning around 8:50 a.m. and continuing through the night hours of August 22, 1990, he appeared alert, responsive, and cooperative.

## STANDARDS OF REVIEW

Numerous past decisions of this court provide guidance on the issue of whether appellant's statements were made voluntarily and whether he voluntarily consented to warrantless searches. Initially, we observe that appellant's critical interrogation occurred before adversarial criminal proceedings were commenced against him. In such case, we have stated that

> [t]he only constitutional claim that [the appellant] can make is an infringement of his right not to be compelled to be a witness against himself or testify against himself in any criminal case in violation of the Fifth Amendment of the United States Constitution and Art. 1, § 11 of the Wyoming Constitution.

*Best v. State*, 736 P.2d 739, 742 (Wyo.1987).

█ Regrettably, appellant did not brief and present an argument on the state constitutional claim. Consequently, we decline to resolve the issue under Wyo Const. art. 1, § 11. *Hance v. Straatsma*, 721 P.2d 575, 577–78 (Wyo.1986). In *Best*, we stated

our commitment to the protection of the right against self-incrimination and to following the requirements set forth in *Miranda.* We said:

> [W]e require appropriate advice with respect to that right including the right to counsel in order to secure the privilege. No further interrogation is permitted after a person in custody has invoked the right to counsel until counsel has been made available or that person [in custody] voluntarily initiates further communication indicating a desire to waive that right. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh. denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *Cheatham v. State,* Wyo., 719 P.2d 612 (1986).

*Best,* 736 P.2d at 742 (other citations omitted). Further, the trial court must first determine whether the accused actually invoked his right to counsel. *Best,* 736 P.2d at 743. This determination, like the determinations whether the accused's statements were made voluntarily and whether the accused's consent to warrantless search was given voluntarily, is a question of fact to be answered in the light of the totality of the circumstances. *Garcia,* 777 P.2d at 606, 607; *Best,* 736 P.2d at 744; *Wilde v. State,* 706 P.2d 251, 256 (Wyo.1985). When we review a trial court's determinations of such questions of fact, we follow time-honored standards. We have required the state to carry the burden of proving by a preponderance of the evidence that the statement was voluntarily made and that the consent was voluntarily given. *Garcia,* 777 P.2d at 605; *Wilde,* 706 P.2d at 256. That same standard applies in the context of the accused's invocation of counsel, *Best,* 736 P.2d at 742. In these various contexts, "the trial court is in the best position to view the credibility of the witnesses." *Garcia,* 777 P.2d at 607. The trial courts' determinations in these various contexts are evidentiary rulings. In this regard, we have said, "The resolution of conflicting evidence is within the province of the trial court, and its findings must be given great weight when considered in light of its opportunity to hear and observe the witnesses." *Garcia,* 777 P.2d at 606.

"We defer to [the trial court's evidentiary rulings] absent appellant's clear showing of an abuse of that discretion." *Garcia,* 777 P.2d at 607.

Appellant asserts that he asked for counsel when detective Burgen and officer DeGraw talked to him around 3:30 a.m. after his return from the hospital. The officers denied that he asked for counsel. Five hours later, when the assistant district attorney talked to appellant, there is no indication that appellant asked again for an attorney. To the contrary, evidence exists that when the law enforcement agents were talking to appellant *only* about his abduction and beating and not about his criminal activities, appellant voluntarily initiated communication indicating a desire to talk about his criminal activities. Appellant told them he wanted to "get some things off his chest." We cannot tell from the record whether the trial judges determined that appellant actually invoked his right to counsel at 3:30 a.m. It is clear, however, their determinations that appellant voluntarily waived his rights and voluntarily made statements are supported by sufficient evidence. Their determinations in this regard necessarily include that: 1) at 3:30 a.m. appellant said he would talk to the detectives after getting some sleep, and 2) at 8:50 a.m., after sleeping, he voluntarily initiated communication indicating his desire to talk to the authorities about his criminal activities. Given appellant's voluntary initiation of that communication, further law enforcement interrogation was permitted. The product of that further interrogation, namely, appellant's inculpatory statements, was admissible in evidence at appellant's trials if the trial courts properly determined that the law enforcement agents advised him of his rights and appellant understood and voluntarily waived those rights. To those issues, we now turn.

In both cases, the trial judges followed "the better practice" and expressly found that appellant's statements were voluntarily made. *Garcia,* 777 P.2d at 606; *Frias v. State,* 722 P.2d 135, 143 (Wyo. 1986). In numerous cases we have re-

viewed the trial court's voluntariness finding. *See, e.g., Garcia; Best; Ramos v. State,* 806 P.2d 822 (Wyo.1991); *Griffin v. State,* 749 P.2d 246 (Wyo.1988); *Best; Frias; Cheatham v. State,* 719 P.2d 612 (Wyo. 1986); *Daniel v. State,* 644 P.2d 172 (Wyo. 1982); *Mayer v. State,* 618 P.2d 127 (Wyo. 1980); *Raigosa v. State,* 562 P.2d 1009 (Wyo.1977); *Dodge v. State,* 562 P.2d 303 (Wyo.1977); *Jarrett v. State,* 500 P.2d 1027 (Wyo.1972); *Lonquest v. State,* 495 P.2d 575 (Wyo.1972), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299. These decisions teach us that voluntariness is to be determined from the totality of the surrounding circumstances; those surrounding circumstances include the background, experience, and conduct of the accused. We apply

> a two-part test to determine if the waiver of the right to remain silent was made voluntarily, knowingly, and intelligently. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Secondly, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Garcia,* 777 P.2d at 606 (citation omitted).

Appellant makes no claim that detective Burgen and officers DeGraw and Reed failed to advise him of his constitutional rights before he made the inculpatory statements in question. Rather, appellant's position is that his statements were the product of law enforcement deception. He claims the law enforcement agents deceived him and his father into thinking they were interrogating him only as a victim and not a suspect. In this context, deceptive law enforcement activity is a necessary predicate to a finding that his statements were not voluntary. *Garcia,* 777 P.2d at 606. The trial courts determined no such deception occurred. Those determinations were made from considerations of the testimony of numerous prosecution and defense witnesses. Those determinations involve a question of fact; on appeal we view the evidence in a light most favorable to the prevailing party below. *Wilde,* 706 P.2d at 256. Conflicting evidence was presented. The resolution of that conflicting evidence is within the province of the trial court. We accord great weight to a trial court's findings because of that court's opportunity to hear and observe the witnesses. *Garcia,* 777 P.2d at 606.

From our careful review of the record we hold that the trial courts' rulings are supported by the evidence. Appellant knew he was a suspect at all pertinent times. When the police took him into custody at 1:00 a.m. on August 22, they placed handcuffs on him and took him to the police department. Officer DeGraw told him he was considered to be the perpetrator of a burglary; he was required to wear distinctive jail clothing and placed in a jail cell. Although the assistant district attorney initially questioned him about his abduction and beating, appellant initiated communication about his criminal activities. At that point, law enforcement officers advised him of his constitutional rights. These officers testified that appellant appeared fine and cooperative. When appellant's father appeared, he knew his son, appellant, was in trouble. Officer DeGraw told him that appellant had stolen property and a statement would be taken. Appellant was 27 years old, had attended high school, was married, and was self-employed as a motor vehicle and body shop mechanic. He had had prior experience with the criminal justice system. Additionally, his father had taught him about his constitutional rights.

Under the totality of the circumstances, the trial courts' decisions concerning the voluntariness of appellant's statements are amply supported in the record. We hold that the trial courts did not err in admitting appellant's statements into evidence in his trials.

2. *Physical Evidence Obtained Through Appellant's Wife.*

■ Appellant contends that all evidence seized by the police from his wife, through her consent and assistance, was inadmissible because her consent and assistance was not voluntarily given. Appellant argues

that his wife consented to and assisted with the searches and seizures of incriminating evidence for the same reason that he gave inculpatory statements, namely, the law enforcement agents deceived them into believing appellant was only a victim, not a suspect. Relying on our previous discussion of the voluntariness of appellant's statements, we reject this argument.

Appellant asserts that his wife was acting as an agent of the state when she produced the evidentiary items. The record does not support that assertion. She produced those items because appellant told her to do so. Neither she nor appellant was misled concerning appellant's status. Their actions were voluntary in light of all of the circumstances. We hold that no deception was practiced by law enforcement agents.

### 3. *Admissibility of Evidence Obtained From Private Individuals Who Obtained the Evidence From Appellant.*

Appellant contends that the evidence seized by the police was the product of appellant's statements coerced by Kunckel and his friends and was, therefore, inadmissible. Recognizing that Fourth Amendment protections do not apply to searches and seizures made by private parties, appellant invokes the exception which pertains when police participation is involved. *See Lustig v. United States,* 338 U.S. 79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1948). Appellant points to evidence of police involvement in the actions of Kunckel and his companions: (1) hearsay testimony that officer Jeff Lord might have been in a shop area adjacent to appellant's shop when the abduction occurred; (2) in July, 1990, when Kunckel reported the burglary of his property to the police, officer DeGraw told him he should solve the crime himself; (3) officer DeGraw allowed Kunckel to view police department files; and (4) Kunckel's testimony that one could draw one's own conclusion as to whether he was acting as a police agent when he abducted and coerced statements from appellant.

In reply to appellant's contentions, the state correctly points out that, after hearing all of the testimony and considering the totality of the circumstances, the trial courts found that Kunckel and his companions were not operating as police agents. No credible testimony placed officer Lord in the vicinity of the abduction. Officer DeGraw's remarks to Kunckel and his allowing Kunckel to view files do not constitute police involvement in Kunckel's later behavior. Kunckel's testimony was a mere conclusory opinion that the trial courts were free to disregard. Ample evidence exists in the record to support the trial courts' decisions. Since no governmental participation was involved, the evidence in question was admissible. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159 (1921).

### 4. *Admissibility of Evidence Obtained as a Result of Appellant's Involuntary Statements.*

Invoking the doctrine of "the fruit of the poisonous tree," *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), appellant claims all evidence obtained either as a result of appellant's involuntary statements to Kunckel or to the police was inadmissible. Because we have affirmed the trial courts' decisions that appellant's statements to the police were voluntarily made and that the police were not involved in the actions of the private parties in obtaining evidence, we find no merit in appellant's contention here.

### 5. *Sufficiency of the Evidence to Support the Conviction of Conspiracy to Commit Aggravated Robbery.*

Appellant contends there was insufficient evidence to show that he and his codefendant, Steve Waite, conspired to commit an aggravated robbery of the victim, John Logan. This contention is without merit.

Our standard of review of such a contention is:

When examining if the verdict is supported by sufficient evidence, we review the record to examine "All the evidence in the light most favorable to the [s]tate * * *."

*Rathbun v. State*, 802 P.2d 881, 882 (Wyo. 1990) (quoting *Mendicoa v. State*, 771 P.2d 1240, 1243 (Wyo.1989)).

The crime of conspiracy is defined in this way:

A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.

Wyo. Stat. § 6–1–303(a) (1988).

The elements of the crime of aggravated robbery are these:

(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:

*        *        *        *        *        *

(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury.

*        *        *        *        *        *

(c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:

*        *        *        *        *        *

(ii) Uses or exhibits a deadly weapon or a simulated deadly weapon.

Wyo. Stat. § 6–2–401 (1988).

■ All that is necessary to prove a *prima facie* case of conspiracy is any overt act that establishes the criminal agreement was acted upon in some way. Thus,

[i]t is not necessary that an overt act be the substantive crime charged * * * as the object of the conspiracy. Nor, indeed, need such an act, taken by itself, even be criminal in character. The function of the overt act in a conspiracy prosecution is simply to manifest "that the conspiracy is at work," and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence.

*Schultz v. State*, 751 P.2d 367, 371 (Wyo. 1988) (quoting *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1084–85, 1 L.Ed.2d 1356, 1384 (1957)) (citations omitted).

■ The formal requirements of the criminal agreement are not stringent. A "meeting of the minds" concept is unnecessary; "[a] mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement." *Burke v. State*, 746 P.2d 852, 855 (Wyo.1987) (quoting Wayne R. LaFave and Austin W. Scott, CRIMINAL LAW at 460–61 (1972)).

■ The record shows that appellant and Steve Waite talked at least a week about robbing John Logan at gunpoint before the actual robbery took place. Waite testified that he and appellant discussed "that we would go in there and hold them and ask them where the stuff was." Waite testified that he and appellant "went out and got the guns and went out and bought the ski masks * * *." Then he stated they bought ski masks to hide their faces, and appellant cut holes in the masks. On the day of the Logan robbery, according to Waite, "[W]e went, got the mask and guns, drove across town to Logan's house." They saw an open window and went inside. They held Logan and his guests at gunpoint and searched the house for drugs and money.

No error exists. We hold that the evidence supports the conviction.

6. *Appropriateness of Appellant's Sentences.*

Appellant maintains the trial courts abused their sentencing discretion in two ways. First, appellant claims they failed to consider probation. Next, he claims that the trial courts' sentences imposed on him are unduly harsh in comparison to the probation given his co-defendant Steve Waite and the probation on a misdemeanor given his abductors.

In reviewing these contentions, we let each case stand on its own peculiar facts. The ultimate question is whether or not the trial court could reasonably conclude as it did. *Kavanaugh v. State*, 769 P.2d 908, 915 (Wyo.1989). A defendant does not have a right to have probation granted; he only has the right to have the trial court consider it. We maintain:

No particular amount of consideration is required. There need be no specific entry into the record of reason why probation is denied nor does the word "probation" even need be mentioned by the court if it can be determined from the proceedings that it has been considered, however slightly.

*Volz v. State*, 707 P.2d 179, 183 (Wyo.1985) (quoting *Beaulieu v. State*, 608 P.2d 275 (Wyo.1980)).

We have reviewed the records in both prosecutions, D.Ct. No. 11233 and D.Ct. No. 11235, and are satisfied the trial court considered probation in each case. In D.Ct. No. 11233, appellant's attorney argued for leniency at sentencing, mentioning that others involved had received probation. Obviously, the question of probation was before the trial court. The trial court was aware, too, of the sentence imposed in D.Ct. No. 11235 and the pre-sentence investigation report.

In D.Ct. No. 11235, appellant's attorney asked for leniency; appellant's parents asked for probation for their son. The presentence investigation report recommended against probation. The probation question was obviously before the trial court.

The record shows that both trial courts considered probation; accordingly, appellant's argument is without merit. Likewise, appellant's proportionality assertion is without merit. The sentences imposed upon him were well within the maximum penalties allowed by statute. Appellant has demonstrated no meritorious grounds for relief.

7. *Failure of One of the Trial Judges to Disqualify Himself.*

In D.Ct. No. 11235, appellant moved to disqualify the trial judge on grounds of prejudice and bias, pointing to that judge's denial of appellant's motion to suppress. Following appellant's conviction, he sees additional prejudice in the trial judge's failure to consider probation at sentencing, the trial judge's sentence of appellant in comparison to the co-defendant's sentence, and the trial judge's increasing appellant's appeal bond to $20,000 cash or surety from an earlier $1,500 recognizance bond.

As with appellant's earlier claims, this claim holds no water. "Bias and prejudice cannot be presumed from unfavorable rulings in the past." *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1211 (Wyo.1990).

In effect, appellant's appellate counsel concedes that the trial judge "probably properly ruled that appellant's affidavit was legally insufficient to establish prejudice such as to require disqualification." We hold that this issue is spurious. Similarly, we hold that appellant's argument based on references to the trial judge's post-conviction actions is baseless. Those actions do not demonstrate any personal prejudice or bias that would have required the trial judge to recuse.

8. *Effective Assistance of Counsel.*

Appellant's final claim is that police deception denied him effective assistance of counsel. Appellant reasons that since law enforcement agents deceived his attorney father and him into thinking the police were questioning him only as a victim, his attorney father did not stay with him during subsequent questioning. Subsequently, appellant concluded that he was denied effective assistance of counsel. Relying on our previous discussion concerning the voluntariness of appellant's statements, we hold that no deception occurred; therefore, police conduct did not operate to deny appellant effective assistance of counsel. We find no error here.

Having carefully considered each of appellant's points on appeal, we affirm the judgments, convictions and sentences in all respects.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

Appellant, as the victim in this case which involved aggravated assault and kidnapping against him, received sentencing on what were essentially property offenses totalling fourteen to twenty years while the perpetrators of the criminal acts against him, who acted at a minimum in conjunction with the police department and through their support and advice, got off with essentially no punishment in a misdemeanor probation sentence. Punishment of the individuals who assaulted and committed the kidnapping against appellant is, at best, even in recognition of plea bargaining benefits in Natrona County, Wyoming, most interesting. This was self-help by police department invitation carried far into the deep confines of criminal law prohibitions.

One wonders where federal civil rights are to be found in this circumstance, except that the assistant district attorney became employed as an assistant United States attorney following this prosecution.

I do not agree with the fact finding, that deception was not practiced on the beaten victim quickly turned suspect, or that a proper request for counsel was constitutionally honored by the police authorities. Things that are implausible are probably untrue; this record abounds therewith.

I dissent.