2004 WY 159

**Lawrence EKHOLM, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 03–130.**

Supreme Court of Wyoming.

Dec. 9, 2004.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Dee Morgan, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   The appellant, Lawrence Ekholm, appeals his felony conviction for conspiracy to possess methamphetamine, with the intent to deliver.   On appeal, Mr. Ekholm claims that the evidence admitted at trial was insufficient to sustain that conviction.   We find that the evidence was sufficient, and affirm.

## ISSUE

[¶ 2]   The sole issue presented by this appeal is whether the record contains sufficient evidence to sustain the appellant's conviction for conspiracy to possess methamphetamine, with the intent to deliver.

## FACTS

[¶ 3]   Maria Hair (Hair) met the appellant through Krista Johnson (Johnson) about a year prior to the appellant's trial in the instant case.  Johnson was living in the appellant's residence at the time and Hair began selling methamphetamine to the appellant through Johnson.  As Hair had more frequent contact with the appellant, and once he "got high in front of" her, she started to "trust" the appellant.  Hair proceeded to supply the appellant methamphetamine on "many occasions" at her residence, as well as the appellant's residence.  She also traded "commercial" methamphetamine to the appellant "even Steven" for "glass" methamphetamine that the appellant obtained from other sources.[1]  According to Johnson, the appellant "only" used "ice" methamphetamine and "never" used "commercial" methamphetamine, and Hair similarly stated that she "only did the glass."  Hair indicated that commercial methamphetamine was "the stuff that we would sell to the general population...."

[¶ 4]   Hair had a "clique" or "little organization of certain people that dealt together."  According to Hair, the appellant ultimately became one of the ten or so members of that clique; the appellant was Hair's "right-hand man" and "like part of the family."[2]  Hair frequently sought the appellant's advice and knowledge when she was "having problems," and the appellant "always knew what was going on.  He always knew."  At times, she would, with the appellant's express permission, meet her "source" or "dope man" at the appellant's residence to "take care of ... business" because Hair "felt safe" at the appellant's residence.  The appellant was present on these occasions, and other occasions in which Hair dealt methamphetamine at her own residence.  Hair also gave the appellant "free" methamphetamine several times in order to borrow his Jeep to go "do a run" and obtain "pounds" of methamphetamine.  She "always asked [the appellant] permission...."

[¶ 5]   In the months prior to January 2002, law enforcement officers learned that Hair was "running methamphetamine" for Joe Cromwell in the Cheyenne area; Hair obtained the methamphetamine in Fort Collins, Colorado, and then distributed it in Cheyenne.[3]  On January 4, 2002, a confidential informant (informant), who had previously purchased methamphetamine from Hair, advised Cheyenne police officer Brian Smith that Hair was "trying to get money together" to obtain methamphetamine in Fort Collins.  The informant had seen Hair with $4,000.00 on her bed and Hair asked to use the informant's vehicle (which she had done previously) because she "needed to go on the 7th."  On January 7, 2002, the informant told Officer Smith that "he thought that [Hair] had made the trip."  Indeed, Hair testified that she had returned to Cheyenne with "about [a] half a pound of dope."

[¶ 6]   Officer Smith outfitted the informant with a "wire" and the informant went to Hair's residence to attempt to purchase methamphetamine.  The informant was unable to purchase methamphetamine from Hair, apparently because he used a pre-arranged signal to indicate that he "was wearing a wire."  Hair began "freaking out," thinking that she was "fixing to get raided," and had those present at the residence gather up her scales, paraphernalia, hypodermic needles, and the "half pound" of "commercial" methamphetamine.  These items were

---

1.  Officer Brian Smith of the Cheyenne police department testified that "commercial" methamphetamine is apparently powder methamphetamine containing more impurities, as opposed to "glass" or "ice," which is methamphetamine containing fewer impurities and is more potent than commercial methamphetamine.  More potency "gives drug addicts a lot better highs....  Among meth users, they don't like [commercial] as much as they like ice or glass."

2.  In investigating Hair, Cheyenne police officer Brian Smith learned that the appellant was among those who assisted Hair in distributing methamphetamine and in later interviews with Officer Smith, Hair and Johnson identified the appellant as someone who "used and sold" methamphetamine with them.

3.  Hair stated that distributing methamphetamine was "where the money was," but also described herself as a "road dog," or someone "that goes and does picking up of drugs.  And that's what I did.  I went and—where other people were too scared to pick up pounds, I wasn't."

placed in a bag and Hair wanted the bag placed in the informant's vehicle. Hair knew that she was wanted by the police[4] and suspected that she was the target of whatever investigation had produced the wire. She needed someone other than herself to transport the bag to the informant's car, and wanted Johnson to do so. Johnson, who was aware that the bag contained approximately a "half pound" of methamphetamine, was too scared to transport the bag and had another individual place the bag near the back seat on the driver's side of the informant's vehicle.

[¶ 7] Officer Smith decided to place a tracking device on the informant's vehicle, which vehicle remained parked at Hair's residence. In order to install the tracking device, the informant retrieved the vehicle from Hair's residence and took it to a designated location. The informant granted law enforcement permission to search the vehicle, and the officers discovered a brown bag on the floorboard behind the driver's seat. The bag contained several scales (two electronic scales and other handheld scales), a ledger book and notes, a small black leather case containing over five ounces of methamphetamine (some of which methamphetamine was packaged in small plastic bags), and paraphernalia associated with the use of methamphetamine. The officers removed those items from the bag, replaced them with deicer to make "it look like something was still" in the bag, and placed the bag in the informant's vehicle. The informant's vehicle was returned to Hair's residence and placed under surveillance.

[¶ 8] In the meantime, Johnson had called the appellant to pick her up at Hair's residence because Johnson was "freaking out." Johnson and the appellant left in the appellant's vehicle and Johnson told the appellant about the informant's conduct at Hair's residence, Hair's reaction to that conduct, and that another individual had placed a bag containing all the "drugs" and "paraphernalia" in the informant's vehicle. Ac-

cording to Johnson, the appellant drove to a location and pointed out where the Division of Criminal Investigation parked its cars and then went to the appellant's residence. Shortly thereafter, Hair and some other individuals arrived.

[¶ 9] At the appellant's residence, Hair was "freaking out" and stressed. She told the appellant (he was the "first person [Hair] went and talked to") what the informant had done, and the appellant was "pissed off...." According to Johnson, the appellant said not to worry about anything, "DCI wouldn't go to his house." Hair asked to borrow the appellant's Jeep in order to "pick up my bag ... that [contained] the methamphetamine" and "paraphernalia."[5] Hair and Johnson were going to retrieve the bag, but the appellant said "no," he did not want Hair and Johnson going alone, and that he would take them. Hair felt "safer" with the appellant because he is "pretty powerful and believable about keeping you safe and things."

[¶ 10] In order to avoid police detection and increase her chances of success, Hair needed someone other than herself to retrieve the bag from the informant's vehicle. Johnson was reluctant to "get the stuff inside the bag" and at one point, the appellant began yelling at her, saying "you [Johnson] are going to get in the car [to retrieve the bag]." Johnson testified that the appellant also pointed a rifle at her, telling her that if she didn't "get out [of the vehicle] when we go over there, drive by and get the drugs then this is what is going to happen to" Johnson. Johnson replied that she would retrieve the bag.

[¶ 11] Prior to leaving the residence, the appellant told those present to empty their pockets so that all "dope and paraphernalia" remained behind. Johnson testified that the "[appellant] knew what we were going to do" and "[e]verybody knew what was going on." They had a "plan," according to Johnson, before leaving the appellant's residence for Johnson to get the "half pound" from the

---

**4.** Hair was the subject of an active arrest warrant for violating her probation.

**5.** Hair did not say "methamphetamine" precisely, but used a designated codeword familiar to

the appellant in referring to the substance. According to Hair, all the members of her clique knew the meaning of her code words.

informant's vehicle. In a later interview with Wyoming Division of Criminal Investigation Special Agent Randal Hoff, the appellant admitted that he knew Hair and Johnson were involved in drug sales and "were involved in some type of drug deal" when the three of them drove to Hair's residence.

[¶ 12] The appellant, Hair, Johnson, and another individual left the appellant's residence in the appellant's vehicle. They drove around the neighborhood near Hair's residence to ensure there were no "cops around...." The appellant was driving, Hair was in the vehicle's front passenger seat, and Johnson and the other individual were in the rear. While in the vehicle, according to Johnson, they discussed getting that "half pound" out of the informant's vehicle because Hair had paid "a lot of money for it" and "had to get it." Hair said that they again discussed Johnson getting out of the appellant's vehicle and retrieving "the bag with meth in it." While driving in the area, Hair said that she even saw the informant in a vehicle, as well as a known police officer. Hair was not deterred because "there was a reason we were there, and we were trying to accomplish that."

[¶ 13] The appellant then drove by Hair's residence to determine whether she had been "raided...." Hair testified that the appellant discussed stopping so that Johnson "can jump out and get" the bag. Johnson was scared of being arrested and declined to retrieve the bag. According to Johnson, the appellant yelled at her to "get the F-ing bag. You can do it. Just do it," and Johnson was specifically told to obtain a smaller bag within the bag at issue (presumably the small black leather case containing the methamphetamine). Law enforcement officers conducting surveillance on the informant's vehicle observed the appellant's vehicle drive slowly through the area and tap its brakes while adjacent to the informant's vehicle.

[¶ 14] The appellant left the area, took the third passenger home, and Hair requested that the appellant take her to a phone so that she could call Susan Spraker to see if she would retrieve the bag. Hair informed the appellant that Susan Spraker would retrieve the bag from the informant's car and meet them back at the appellant's residence. Hair and the appellant "[took] turns" surveilling Hair's residence with binoculars from a nearby school. There was no sign of Spraker and no one heard from her. Unbeknownst to Hair, law enforcement officers had apprehended Spraker as she ran from behind Hair's residence and entered the driver's side of the informant's vehicle.

[¶ 15] Hair and the others decided to return to Hair's neighborhood. The appellant was calm and cool, and trying to drive and "do what he needed to do," while Johnson and Hair "spazzed out...." Hair repeated that she "wanted to get that bag." The law enforcement officers conducting surveillance on the informant's car again observed the appellant's vehicle drive by "very slow[ly]," tap the brakes, make a "short stop" or "rolling stop," and continue on. After the appellant's vehicle departed Hair's neighborhood, the officers stopped the appellant's vehicle and arrested Hair, Johnson, and the appellant.

[¶ 16] When asked what the group was going to do upon retrieving the methamphetamine, Johnson replied that they would give it to Hair.[6] Hair specifically stated the following during her trial testimony:

> [Prosecutor:] Once you got [the methamphetamine] what were you going to do with it?
>
> [Hair:] Um, what I always do with it, sell it. I was going to leave town for the moment because of that—part of the meth that was in—the meth right there was in that bag, that was my money. Everything else had been taken care of. It was free and clear. All debts were paid. What money I made off that was going to get me out of the hole.[7]
>
> Q. Did you tell [the appellant] that?

---

6. Johnson further stated, somewhat speculatively, that Hair would "probably" sell it to pay back her dealer in Fort Collins, and the appellant would "probably" get something out of it. However, this would not appear to be abnormal in light of the prior conduct between the three individuals.

7. Hair elaborated that the methamphetamine at issue was her "profit...."

A. Did I tell him? I told him that was my stuff—that was my money, that was part of the conversation we had. I've got to get the bag. That's my money. I've got to have it, you know.

Q. What was your plan if you did get out of town? Was [the appellant] going to get anything out of that?

A. Out of that? No, I didn't offer him nothing.[8]

With respect to the quantity of the methamphetamine at issue, Special Agent Hoff testified that five ounces of methamphetamine is a "retailer's amount"—someone would "purchase that [quantity] with the idea of turning around and reselling it to make a profit;"[9] a "use" amount of methamphetamine is typically a 3.5–gram quantity. With respect to the manner in which the methamphetamine was packaged, Hair stated that the "only time [she would] ... bag [her] stuff up" was to sell it.

[¶ 17] The appellant was ultimately charged with conspiracy to possess methamphetamine with the intent to deliver, a felony, in violation of Wyo. Stat. Ann. § 35–7–1042 (LexisNexis 2003) and Wyo. Stat. Ann. § 35–7–1031(a)(i) (LexisNexis 2003). A Laramie County jury found the appellant guilty of that offense in December 2002, and the district court sentenced the appellant to imprisonment for three to five years at the Wyoming State Penitentiary. The appellant now appeals from the district court's judgment and sentence.

### STANDARD OF REVIEW

[¶ 18] Our standard of review is as follows:

When reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State*, 994 P.2d 324, 329 (Wyo.1999); and see *Pool v. State*, 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substi-

tute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State*, 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001). We also

leave out of consideration the evidence presented by the unsuccessful party which conflicts with the successful party's evidence, and afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury when we are applying this rule....

*Estrada–Sanchez v. State*, 2003 WY 45, ¶ 6, 66 P.3d 703, 707 (Wyo.2003). " 'The jury is entitled to weigh and disregard the evidence intended to discredit the witnesses for the State.' " *Willis v. State*, 2002 WY 79, ¶ 15, 46 P.3d 890, 895 (Wyo.2002) (*quoting Broom v. State*, 695 P.2d 640, 642 (Wyo.1985)).

### DISCUSSION

[¶ 19] The appellant argues that the evidence was insufficient to prove that "he conspired or agreed with ... Hair or any other person, having the specific intent to deliver or distribute the methamphetamine placed" in the informant's car. Regarding Hair's testimony in particular, the appellant states that "there was no agreement or understanding with [the appellant] to deliver or distribute the methamphetamine, that he was to have no involvement in that regard, and that it was her methamphetamine and she was taking it and leaving town." At most, according to the appellant, the evidence demonstrated that the appellant merely "had knowledge that meth was in the [informant's] vehicle and that [Hair] wanted it back, which may establish that he conspired with [Hair]

---

8. Nor did Hair and the appellant discuss selling any of the methamphetamine at issue to the appellant.

9. Special Agent Hoff testified that the wholesale price of five ounces of methamphetamine at that time was $5,000.00, and the street value of that quantity was $14,000.00.

and others to possess the meth, which [the appellant] still disputes."

[¶ 20] The appellant further characterizes the evidence as follows: (1) there is no evidence that the appellant sold methamphetamine or helped Hair distribute methamphetamine; (2) the appellant was not part of Hair's distribution ring and was not one of Hair's usual conspirators in selling methamphetamine; (3) the appellant was merely a methamphetamine user and to the extent he may have traded methamphetamine with Hair, it was for his own personal use; (4) Hair, not the appellant, was the target of the narcotics investigation and was the person known for dealing methamphetamine; (5) the methamphetamine in the informant's car belonged to Hair, Hair instigated the attempt to retrieve that methamphetamine, and other individuals (not the appellant) offered to retrieve the methamphetamine for Hair; (6) Hair did not testify of any plans to sell the methamphetamine if it were retrieved from the informant's vehicle, and testified that she had no agreement with the appellant to distribute any of that methamphetamine to the appellant; and (7) Hair had a single-minded, selfish, purpose for the methamphetamine independent of the appellant, and the only understanding between Hair and the appellant was that the appellant would drive Hair to her residence because she felt safe with the appellant and needed the appellant for emotional support.

[¶ 21] The appellant was charged with conspiracy to possess methamphetamine, with the intent to deliver. In that regard, Wyo. Stat. Ann. § 35–7–1042 states that any "person who attempts or conspires to commit any offense under this article within the state of Wyoming ... shall be punished by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy." Wyo. Stat. Ann. § 35–7–1031(a) further provides that it is "unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance," except as authorized by the Wyoming Controlled Substances Act.

[¶ 22] A conspiracy is "commonly ... defined as an agreement between two or more people to commit an unlawful act." *Wehr v. State,* 841 P.2d 104, 109 (Wyo.1992). The elements

> of a conspiracy involving a controlled substance are: (1) at least a tacit understanding between the defendant and a co-conspirator to commit an act violative of Wyoming's controlled substances act, and (2) intent by the defendant to commit the elements of the offense which was the object of the understanding. Due to the covert nature of the crime, circumstantial evidence may be relied upon to establish the conspiracy.

*Sotolongo–Garcia v. State,* 2002 WY 185, ¶ 14, 60 P.3d 687, 690 (Wyo.2002). We have said that

> the formal requirements of the criminal agreement are not stringent. A "meeting of the minds" concept is unnecessary; "[a] mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement."

*Burk v. State,* 848 P.2d 225, 235 (Wyo.1993) (*quoting Burke v. State,* 746 P.2d 852, 855 (Wyo.1987)). More particularly,

> [t]he agreement that must be shown to support a conviction of a conspiracy to commit a crime is not the same as the "meeting of the minds" demanded for a contract. In *Bigelow [v. State],* 768 P.2d [558] at 562 [ (Wyo.1989) ], we said:
>
>> "One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is ***not*** the case. Although there continues to exist some uncertainty as to the precise meaning of [the] word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement."

*Wehr,* 841 P.2d at 109–110 (emphasis in original). " 'Because most conspiracies are clandestine in nature, the prosecution is seldom

able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may "rely on inferences drawn from the course of conduct of the alleged conspirators." ' " *Martinez v. State,* 943 P.2d 1178, 1183 (Wyo.1997) (*quoting Smith v. State,* 902 P.2d 1271, 1281–82 (Wyo. 1995)).

[¶ 23] We find that the evidence, when viewed according to the applicable standard of review, was sufficient to sustain the appellant's convictions. In the instant case:

(1) The evidence established that the object, or common purpose, of the conspiracy in the instant case was to regain possession of the "half pound" of "commercial" methamphetamine in Hair's bag so that Hair could sell the methamphetamine.

(2) The requisite agreement can reasonably be inferred from the communication between Hair, Johnson, and the appellant regarding what occurred vis a vis the informant, the ensuing discussions based on that information at the appellant's residence and in his vehicle, and the conduct of Hair, Johnson, and the appellant at the appellant's residence and upon leaving the residence. *See United States v. Dozal,* 173 F.3d 787, 797 (10th Cir.1999) (the "jury may infer an agreement from circumstantial evidence that indicates concerted action in furtherance of a common purpose.") [10] The instant case is not one involving mere discussion or equivocal statements without an agreement.

(3) The appellant's intentional or active participation in the conspiracy can reasonably be inferred from the relationship between the appellant, Hair, and Johnson prior to January 7, 2002, the communication between Hair, Johnson, and the appellant regarding what occurred vis a vis the informant, the appellant's role in the ensuing discussions at the appellant's residence and in his vehicle, the particular statements attributed to the appellant during these discussions, and the appellant's conduct at his residence and upon leaving the residence. *See McLaughlin v. State,* 626 P.2d 63, 66 (Wyo. 1981) ("defendant must intentionally take part in or actively participate in the conspiracy") and *United States v. Johnston,* 146 F.3d 785, 789 (10th Cir.1998), *cert. denied,* 525 U.S. 1088, 119 S.Ct. 839, 142 L.Ed.2d 694 (1999) (*quoting United States v. Johnson,* 42 F.3d 1312, 1319 (10th Cir.1994), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995)) (jury can presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the conspiracy's objective).

(4) The requisite intent can reasonably be inferred from the combination of the evidence referenced in the previous two subparagraphs, and the evidence concerning Hair's stated purpose in regaining possession of the methamphetamine (which purpose she expressly communicated to the appellant), the testimony regarding the significance of the quantity of the methamphetamine involved, and the testimony regarding the manner in which the methamphetamine was packaged. *See, for example, Johnston,* 146 F.3d at 789–91 and *United States v. Riggins,* 15 F.3d 992, 994 (10th Cir.1994) (government required to prove that the appellant "knew the object of the conspiracy was the distribution of [methamphetamine], and that [he] agreed to cooperate in achieving that objective").

(5) Many of the appellant's evidentiary characterizations are simply contrary to the record, especially when the evidence is viewed in a light most favorable to the State. The state of the record is not such that the appellant and Hair engaged in a purely "buyer/seller" relationship with respect to methamphetamine, or that the appellant was merely associated with members of the conspiracy, merely possessed knowledge of the conspiracy, merely was aware of the conspiracy's common purpose, or merely was present at the crime scene.

[¶ 24] That the appellant did not actually intend to distribute the methamphetamine at issue *himself* does not render

---

**10.** "Section 35–7–1042 was derived ... from ... 21 U.S.C. § 846.... As such, we have looked to the case law interpreting the federal conspiracy provision as persuasive authority when interpreting § 35–7–1042." *Palato v. State,* 988 P.2d 512, 514 (Wyo.1999) (footnote omitted).

the evidence insufficient to sustain his conviction.

A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. See *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 253–254, 60 S.Ct. 811, 858–859, 84 L.Ed. 1129 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. See *Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183–1184, 90 L.Ed. 1489 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." *United States v. Holte*, 236 U.S. 140, 144, 35 S.Ct. 271, 272, 59 L.Ed. 504 (1915). A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense. *United States v. Rabinowich*, 238 U.S. 78, 86, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915).

. . .

Our recitation of conspiracy law comports with contemporary understanding. When Congress passed RICO in 1970, . . . the American Law Institute's Model Penal Code permitted a person to be convicted of conspiracy so long as he "agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime." Model Penal Code § 5.03(1)(a) (1962). As the drafters emphasized, "so long as the purpose of the agreement is to facilitate commission of a crime, the actor need not agree 'to commit' the crime." American Law Institute, Model Penal Code, Tent. Draft No. 10, p. 117 (1960). The Model Penal Code still uses this formulation. See Model Penal Code § 5.03(1)(a), 10 U.L.A. 501 (1974).

A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself. See *Callanan v. United States*, 364 U.S. 587, 594, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961).

*Salinas v. United States*, 522 U.S. 52, 63–65, 118 S.Ct. 469, 139 L.Ed.2d 352, *cert. denied*, 522 U.S. 1014, 118 S.Ct. 599, 139 L.Ed.2d 487 (1997). *See also United States v. Young*, 954 F.2d 614, 619 (10th Cir.1992) (defendant "need not intend to personally distribute the marijuana so long as the conspiracy, which he has knowingly joined himself to, has the objective and intent of distributing marijuana"); *Johnston*, 146 F.3d at 789; *Hankinson v. State*, 2002 WY 86, ¶ 8, 47 P.3d 623, 627 (Wyo.2002); *Marquez v. State*, 12 P.3d 711, 715 (Wyo.2000) ("It is well established that each member of a conspiracy is criminally accountable for the acts of every other member"); and *McLaughlin*, 626 P.2d at 66 ("it is not necessary to a charge of conspiracy that the defendant actively participate in the substantive crime which is the object of the conspiracy").

[¶ 25] Finding sufficient evidence to sustain the appellant's conviction, we affirm.