2005 WY 92

**Christopher LEYO, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–18.

Supreme Court of Wyoming.

Aug. 12, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Ryan R. Roden, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Dee Morgan, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, JJ., and SANDERSON, D.J.

GOLDEN, Justice.

[¶ 1] Christopher Leyo appeals his convictions on two counts of delivering a controlled substance (methamphetamine) [1] and one count of conspiracy to deliver a controlled substance (methamphetamine). [2] Leyo claims there was insufficient evidence to sustain his convictions and prosecutorial misconduct occurred during closing argument. Finding no error, we affirm Leyo's convictions.

## ISSUES

[¶ 2] Leyo submits the following issues for this Court's review, with which the State generally agrees:

I. Whether there was sufficient evidence to convict appellant for delivery of a controlled substance and conspiracy to deliver a controlled substance.

II. Whether prosecutorial misconduct occurred when the prosecutor improperly appealed to community outrage in closing argument, and whether the trial court erred in failing to rectify this error with a proper curative instruction, denying appellant a fair trial.

## FACTS

[¶ 3] In the spring of 2002 Amanda Inman began working as a confidential informant for the Division of Criminal Investigation (DCI). Inman was an intravenous methamphetamine user and a convicted felon. Inman began working for DCI as an informant because she and her boyfriend had been caught delivering methamphetamine. In return for her cooperation, the State offered to recommend probation on the delivery charges, drop other charges against her, and help her boyfriend. Pursuant to this deal, Inman provided information to DCI on several different criminal matters.

[¶ 4] On January 27, 2003, Inman learned she was staying in the same motel as an acquaintance, Michelle Mastin. She went to Mastin's room. Inman found four people in the room, including Mastin and Leyo. Leyo informed Inman that he had some methamphetamine he needed to sell. The next morning, Inman informed an agent with the DCI that she could purchase a quarter gram of methamphetamine from Leyo for $35.00. DCI proceeded to make arrangements for a controlled buy and executed the controlled buy the same day.

[¶ 5] DCI followed standard operating procedures for a controlled buy. They had Inman come to the DCI office. After her arrival, a DCI agent searched her vehicle. Inman was searched by a female employee of DCI and fitted with a wireless transmitter. Inman was then given pre-recorded buy money. Inman left the DCI office with, to the best knowledge of the law enforcement

---

1. Wyo. Stat. Ann. § 35–7–1031(a) (LexisNexis 2005) provides in pertinent part:
 (a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

2. Wyo. Stat. Ann. § 35–7–1042 (LexisNexis 2005) provides:
 Any person who attempts or conspires to commit any offense under this article within the state of Wyoming or who conspires to commit an act beyond the state of Wyoming which if done in this state would be an offense punishable under this article, shall be punished by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy.

representatives present, nothing but the pre-recorded buy money. Inman drove straight to Mastin's motel, at all times followed by law enforcement officers. Inman drove normally and was not seen moving her hands around or reaching for anything.

[¶ 6] The controlled buy took place in Mastin's motel room. Inman went alone to the motel room. DCI maintained surveillance around the motel and monitored the transaction by way of the wireless transmitter. The proceedings as received from the wireless transmitter were recorded to audiotape. Inman returned to her car and drove back to the DCI office, under constant surveillance. Back at the office, Inman was searched again, the methamphetamine was recovered, and Inman was questioned about the buy (debriefed). Inman's car was also searched. Inman then left the office.

[¶ 7] The second buy took place on February 4, 2003. Prior to February 4, Mastin told Inman that, although her source was leaving town and she personally could not get more methamphetamine for Inman, Leyo could sell Inman some methamphetamine. Inman informed DCI of her negotiations with Mastin. DCI set up a controlled buy and the same procedures were followed. Inman came to the DCI office, she was searched and wired, and she was given pre-recorded buy funds.

[¶ 8] Inman's driver's license had been suspended so this time a law enforcement officer drove Inman to the buy location. Inman was kept under constant surveillance. Inman entered the motel room alone and returned to the officer waiting for her in the parking lot within six or seven minutes. The proceedings as received from the wireless transmitter were recorded. On this occasion, Inman purchased 1.75 grams of methamphetamine from Leyo for $130.00. Inman was driven back to the DCI office, the methamphetamine was recovered, Inman was searched and debriefed. The information Inman gave to DCI in the debriefing after both buys corresponded to what DCI agents were able to hear over the transmitter. The audiotapes that recorded the transactions over the transmitter were played to the jury and admitted as evidence.

[¶ 9] DCI hoped to make further purchases from Leyo (and hopefully gather evidence regarding Leyo's supplier(s)), but Inman was caught driving with a suspended license and sentenced to forty-five days in jail. Once DCI found out that Inman would be in jail and unavailable to conduct any more controlled buys for them, DCI looked for Leyo and Mastin, but they had vacated the area. Thus, DCI was unable to obtain a search warrant to find pre-recorded buy funds or other evidence of drug related activity.

[¶ 10] Leyo was eventually arrested on April 22, 2003, and charged with two counts of delivering methamphetamine and one count of conspiracy to deliver methamphetamine. The case was tried to a jury in September 2003. Mastin was not located in time for her to testify at Leyo's trial. Thus, although the State called several law enforcement officers to testify regarding their respective roles in the controlled buys, Inman was the only witness to provide direct testimony of the actual transactions. Specifically, Inman was the only witness to testify that Leyo was the person from whom she bought the methamphetamine. At the time of trial, Inman was in jail for violation of the terms of her probation. She also had been diagnosed with, and was on medication for, schizophrenia. Leyo moved for a judgment of acquittal at the end of the State's case. The motion was denied. Leyo did not put on a defense. The jury convicted Leyo on all three charges.

## DISCUSSION

### A. Sufficiency of the Evidence

*Standard of Review*

▆▆▆▆ [¶ 11] On appeal, Leyo first challenges the sufficiency of the evidence supporting his conviction. When the issue of sufficiency of the evidence is raised on appeal, this Court must respect the role of the fact-finder, in this case the jury, to weigh the credibility of the respective witnesses. A jury is entitled to weigh and disregard any evidence intended to discredit the witnesses for the State. *Broom v. State,* 695 P.2d 640, 642 (Wyo.1985). This Court does not second-

guess the credibility determinations of the jury. *Estrada–Sanchez v. State,* 2003 WY 45, ¶ 6, 66 P.3d 703, ¶ 6 (Wyo.2003). To that end, this Court must presume that the jury resolved any conflict in the evidence in favor of the prosecution. *McFarlane v. State,* 2001 WY 10, ¶ 4, 17 P.3d 31, ¶ 4 (Wyo.2001). Ultimately, in order to preserve the role of the fact-finder, this Court does not review the record evidence to determine if it agrees with the verdict, but rather the critical inquiry of this Court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Ekholm v. State,* 2004 WY 159, ¶ 18, 102 P.3d 201, ¶ 18 (Wyo.2004); *Tanner v. State,* 2002 WY 170, ¶ 7, 57 P.3d 1242, ¶ 7 (Wyo.2002).

### Discussion

[¶ 12] Initially, Leyo questions this Court's standard of review on claims that the evidence adduced at trial was insufficient to support a guilty verdict. In a confusing argument, Leyo seemingly contends that this Court has strayed from the standard of review established by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Court finds Leyo's contention peculiar, particularly in light of the fact this Court has repeatedly directly quoted *Jackson* when explaining our standard of review:

> When addressing a claim that the evidence is insufficient to sustain the conviction for a crime, we apply the following standard:
>
> > This Court assesses whether all the evidence which was presented is adequate enough to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Hodges v. State,* 904 P.2d 334, 339 (Wyo. 1995) (citation omitted); *see also Robinson v. State,* 11 P.3d 361, 368 (Wyo.2000), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001). This inquiry does not require a court to determine whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. *Broom v. State,* 695 P.2d 640, 642 (Wyo. 1985). Rather, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* This standard gives the trier of fact the responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* " **'Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.' "** *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

*Willis v. State,* 2002 WY 79, ¶ 8, 46 P.3d 890, ¶ 8 (Wyo.2002) (emphasis added).

[¶ 13] Leyo seems to be under the impression this Court has strayed from *Jackson* by essentially adopting two different standards of review. Leyo grounds this argument on the fact that occasionally this Court states that our review for sufficiency of evidence requires us to "accept as true the prosecution's evidence, give to the prosecution those inferences which may be reasonably and fairly drawn from that evidence, and do not consider the defendant's evidence in conflict with the prosecution's evidence and the inferences therefrom." *Brown v. State,* 2005 WY 37, ¶ 18, 109 P.3d 52, ¶ 18 (Wyo.2005). Leyo concludes that when this Court states the standard of review in the above form, this Court limits the evidence it reviews to only that introduced by the prosecution. We fail, however, to understand the basis for this conclusion, since it would be impossible for this Court to determine what

evidence conflicts if it does not review all record evidence.

[¶ 14] Leyo extends his argument by asserting that, once it is established that this Court reviews all record evidence, it naturally follows that this Court should consider all evidence when conducting its sufficiency review. Leyo's ultimate contention is that this Court "is not foreclosed from reviewing the entire record, even evidence that contradicts or conflicts with the State's theory and evidence" and indeed that this Court should not turn "a 'blind eye' to any and all evidence that happens to conflict with the State's evidence." In other words, Leyo is asking this Court to adopt a standard of review that fails to give deference to the fact-finder.

■ [¶ 15] We refuse to accept Leyo's argument that we alter our standard of review to essentially conduct a de novo review of the evidence. This Court has adopted and maintains a very consistent review process when reviewing whether sufficient evidence is present to sustain a criminal conviction. We do not reweigh the evidence. It is the province of the fact-finder to weigh credibility and resolve conflicts in the evidence. In order to honor the role of the fact-finder, we presume the existence of every fact the fact-finder could reasonably deduce from the evidence that supports its verdict. The natural corollary is that this Court will disregard any evidence or legally supportable inferences that can be drawn from the evidence that conflicts with the verdict. Once this Court determines the facts the jury could have found in support of its verdict, we conclude our review by determining whether, based upon those facts, a quorum of reasonable and rational individuals could come to the same result as the jury actually did.

[¶ 16] This Court expressly rejects Leyo's argument that this Court should determine "factual sufficiency" by weighing all evidence, including conflicting and contradictory evidence. Such argument is inconsistent with our duty to respect the role of the fact-finder. As we recently stated in regard to a similar argument:

> Harlow's argument actually turns the legal standard on its head. The essence of Harlow's argument is that the jury should have believed Dowdell's protestations of Harlow's relative innocence, and should have resolved any apparent uncertainties in Ramon's testimony in favor of Harlow. But that is not the law. This Court does not look to see if there is evidence that might have supported the defendant's position. Rather,
>
> > " '[t]he appellate test for sufficiency of evidence is whether a rational trier of fact could have been sufficiently armed by the evidence to find the essential elements of the offense beyond a reasonable doubt. In assessing that issue, we view the evidence in a light most favorable to the state, affording [it] the benefit of all reasonable inferences to be drawn therefrom. It is not our task, let alone our place, to reweigh the evidence or reexamine the credibility of the witnesses.' "
>
> *Nollen v. State*, 12 P.3d 682, 684 (Wyo. 2000) (quoting *Rodriguez v. State*, 962 P.2d 141, 148 (Wyo.1998), and *Curl v. State*, 898 P.2d 369, 375 (Wyo.1995)).

*Harlow v. State*, 2005 WY 12, ¶ 41, 105 P.3d 1049, ¶ 41 (Wyo.2005) (alterations in original). Leyo has presented this Court with no compelling reason to turn our established standard of review on its head.

■ [¶ 17] Our accepted standard of review is easily applied to this case. This Court must review the record evidence and determine if there is sufficient evidence by which a quorum of rational individuals could have convicted Leyo. On appeal, Leyo does not seriously challenge that two drug buys actually took place. Instead, Leyo contends that the evidence is insufficient to identify him as the person who sold methamphetamine to Inman. In reviewing the evidence in this regard, we find that the sole evidence directly identifying Leyo as the person involved in the drug transactions comes from the testimony of Inman. Inman testified at trial that she bought methamphetamine from Leyo on two separate occasions. One buy was arranged directly through Leyo and one buy was arranged through Mastin. Inman specifically testified that on both occasions it

was Leyo who delivered the methamphetamine.

[¶ 18] Leyo acknowledges that Inman provided this testimony. However, Leyo argues that corroborating evidence is required before a rational jury could find guilt beyond a reasonable doubt. This Court has never adopted a bright-line rule regarding the quantum of evidence required before a jury can convict a criminal defendant. There simply must be sufficient evidence to legally support a conviction. Inman's testimony, given from personal, first-hand knowledge, provided direct evidence of Leyo's involvement. This testimony is sufficient, as a matter of law, to support Leyo's convictions for drug trafficking.

[¶ 19] Leyo continues that, because Inman is an "all around bad person," it is irrational and unreasonable for the jury to believe anything she said. Leyo also argues that no rational jury would have relied on Inman's testimony because her testimony was internally inconsistent. The jury obviously did not agree with Leyo's position. Again, it is within the province of the jury to determine the credibility of witnesses and resolve conflicts in the evidence. This Court will not second-guess the evidentiary determinations of the jury.

[¶ 20] Leyo presents similar arguments in his claim that insufficient evidence exists to support his conviction of conspiracy to deliver methamphetamine. Again, the only direct evidence regarding the existence of a conspiracy was provided through Inman's testimony. Again, Leyo attacks the verdict by arguing that, because there is no evidence corroborating Inman's testimony, there is not enough evidence to support his conspiracy conviction. We reiterate that there is no bright-line rule regarding the quantum of evidence required before a jury can convict a criminal defendant. The essential determination is simply if there is evidence supporting a finding of the elements of conspiracy beyond a reasonable doubt.

[¶ 21] Leyo also argues that, even assuming the jury believed Inman, Inman's testimony is insufficient to prove an agreement existed between himself and Mastin to deliver methamphetamine as a matter of law. Under Wyoming law, a conspiracy can be found if there is evidence of a tacit agreement between parties to commit a crime:

A conspiracy is "commonly ... defined as an agreement between two or more people to commit an unlawful act." *Wehr v. State*, 841 P.2d 104, 109 (Wyo.1992). The elements

> of a conspiracy involving a controlled substance are: (1) at least a tacit understanding between the defendant and a co-conspirator to commit an act violative of Wyoming's controlled substances act, and (2) intent by the defendant to commit the elements of the offense which was the object of the understanding. Due to the covert nature of the crime, circumstantial evidence may be relied upon to establish the conspiracy.

*Sotolongo–Garcia v. State*, 2002 WY 185, ¶ 14, 60 P.3d 687, 690 (Wyo.2002). We have said that

> the formal requirements of the criminal agreement are not stringent. A "meeting of the minds" concept is unnecessary; "[a] mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement."

*Burk v. State*, 848 P.2d 225, 235 (Wyo. 1993) (quoting *Burke v. State*, 746 P.2d 852, 855 (Wyo.1987)). More particularly,

> [t]he agreement that must be shown to support a conviction of a conspiracy to commit a crime is not the same as the "meeting of the minds" demanded for a contract. In *Bigelow [v. State]*, 768 P.2d [558] at 562 [ (Wyo.1989) ], we said:

> > "One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is **not** the case. Although there continues to exist some uncertainty as to the precise meaning of [the] word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understand-

ing will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement."

*Wehr*, 841 P.2d at 109–110 (emphasis in original). " 'Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may "rely on inferences drawn from the course of conduct of the alleged conspirators." ' " *Martinez v. State*, 943 P.2d 1178, 1183 (Wyo.1997) (quoting *Smith v. State*, 902 P.2d 1271, 1281–82 (Wyo.1995)).

*Ekholm*, ¶ 22. The jury was instructed accordingly.

[¶ 22] Despite this recent pronouncement regarding the elements of conspiracy, Leyo initially suggests that the "tacit" agreement standard should be changed to require proof of a "meeting of the minds" before a conspiracy can be found. However, Leyo retracts from this argument by analyzing the facts of this case in the context of the tacit agreement standard. Because Leyo has not suggested the outcome would be any different under the "meeting of the minds" standard he proposes, we will not address the issue further.

[¶ 23] Looking to Inman's testimony, Inman testified that she believed Mastin and Leyo were working together. Inman's testimony established that she arranged the first buy directly with Leyo while they were in Mastin's motel room, with Mastin present. Inman returned the next day to Mastin's motel room and bought methamphetamine from Leyo, again with Mastin present. Inman arranged the second methamphetamine purchase through Mastin. At some point, Inman told Mastin that she wanted to buy 3.5 grams of methamphetamine (commonly referred to as an eight ball). Mastin told Inman that her supplier was leaving town so she could not personally sell any methamphetamine to Inman, but Leyo had some methamphetamine he would sell to Inman.

[¶ 24] Once the controlled buy was set up, Inman went to a room at a different motel as Mastin had moved out of the original motel.

Mastin answered the door. Leyo was in the room. Mastin explained to Inman that Leyo had not been able to get the eight ball that Inman had wanted, but that Leyo had 1.75 grams (commonly referred to as a "teener") he would sell to her. Specifically, Inman testified that Mastin told her "[Leyo] couldn't get a hold of an eight-ball, so a teener was the only thing they could do." Inman agreed to purchase the amount of methamphetamine Mastin told her was available. Leyo handed Inman the methamphetamine, and Inman placed the DCI purchase money on the bed.

[¶ 25] The testimony presented is sufficient to support a determination by a rational jury that Leyo and Mastin conspired to deliver methamphetamine to Inman. Direct evidence of an agreement is not necessary to a finding that a conspiracy existed. A jury may make reasonable inferences from the course of conduct of the alleged conspirators. In this case, Leyo sold methamphetamine out of Mastin's motel room with Mastin's knowledge. Mastin negotiated for Inman to buy methamphetamine from Leyo at least partially with Leyo's knowledge. Leyo delivered to Inman the quantity of methamphetamine agreed to between Inman and Mastin. From this conduct, it is reasonable to infer that Mastin and Leyo agreed to work together to deliver methamphetamine. Leyo actively engaged in furthering the conspiracy's common purpose by delivering methamphetamine to Inman in fulfillment of the terms of the purchase as negotiated by Mastin and Inman. Inman's testimony is sufficient to support a finding that Leyo conspired with Mastin to deliver methamphetamine.

## B. Prosecutorial Misconduct

### *Standard of Review*

[¶ 26] Leyo claims that the prosecutor engaged in misconduct during his closing argument.

Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether the accused's case has been so prejudiced as to constitute the denial of a fair trial. *English v. State*, 982 P.2d 139, 143 (Wyo.1999) (quoting *Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998);

*Arevalo v. State,* 939 P.2d 228, 230 (Wyo. 1997)). The propriety of any comment within a closing argument is judged "in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial." *Wilks* [*v. State,* 2002 WY 100, 49 P.3d 975 (Wyo. 2002) ], at ¶ 26 (citing *Burton v. State,* 2002 WY 71, ¶ 11, 46 P.3d 309, ¶ 11 (Wyo.2002)). The burden of proving prejudicial error rests with the appellant. *Wilks,* at ¶ 26; *see also Taylor* [*v. State,* 2001 WY 13, 17 P.3d 715 (Wyo.2001) ], at ¶ 19; *Tennant v. State,* 786 P.2d 339, 346 (Wyo.1990). *Duke v. State,* 2004 WY 120, ¶ 100, 99 P.3d 928, ¶ 100 (Wyo.2004). Because Leyo failed to make a contemporaneous objection to the alleged instance of prosecutorial misconduct, we review the closing argument for plain error. "Plain error exists when 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him." *Condra v. State,* 2004 WY 131, ¶ 6, 100 P.3d 386, ¶ 6 (Wyo.2004) (quoting *Dysthe v. State,* 2003 WY 20, ¶ 23, 63 P.3d 875, ¶ 23 (Wyo. 2003)).

### Discussion

[¶ 27] Leyo argues that the prosecutor prejudicially appealed to the jurors' passions and prejudices by telling them, in the following remarks, about legislative policy behind the prohibition against delivery of methamphetamine and why the drug culture was bad:

> The law says you do not distribute controlled substances. And I think probably one of the best arguments that the legislature might be able to present as to why they came up with that law was Amanda Inman, herself. You look at that, think about what her life was like. You can see the destruction that drugs have caused in her life. She's an intravenous drug user and has been so for the last three years. She'll have to be shut up.
>
> A week ago when she got arrested, she was arrested for more trouble. She's been in trouble because she's a drug user. And, you know, it would be nice if we could go out and get boy scouts or Roman Catholic choir boys to be our confidential informants. But unfortunately, they don't run in the circles where drugs are being dealt. And that's why we have to deal with the Amanda Inmans of the world. And that's why we have to do the things that we do. It's a shame. It's really a shame this kind of problem exists. And it's a shame that's the kind of thing that we have to do to combat it.
>
> But I believe it was King Tristanni used to say, "If you are going to tell a story about life in hell, you can't be surprised that your witnesses all end up being devils." Unfortunately, that's exactly what we've got here. There is a very bad situation going on with drug use.
>
> As I say, Amanda Inman is a fairly clear example of the kind of wreckage that drug use results in. She is not a person you would want to spend a whole bunch of time with.

For the sake of context, we will continue a little further in the prosecutor's statements:

> And I think that's what makes this a tough job for police. The fact of the matter is you are going to have to look at Amanda, herself. I mean, I know you did; I watched you as she testified.
>
> The question you've got to resolve in your own mind is do you believe her? Is she somebody that you can believe? And you are going to have to assess her testimony because she basically, as everybody has pointed out from the beginning, was the one who was telling what happened in this case....
>
> * * * *
>
> ... But what happened behind those closed doors and drawn curtains at the [two motels], you are going to have to rely on what Amanda Inman said.

[¶ 28] After the prosecutor finished his closing argument, the trial judge requested both counsel approach the bench. The trial judge expressed concern about the remarks by the prosecutor referring to the public policy behind the legislature's criminalizing drug usage and dealing. The trial judge

expressly asked the defense counsel for her thoughts on the matter. The defense counsel replied that she did not object because she did not want to draw more attention to the remark. The defense counsel did not request a curative instruction. Nothing further occurred regarding the prosecutor's remarks. Leyo presents no argument supporting his assertion, found only in his phrasing of this issue, that the trial court erred in not overriding the tactical decision of the defense counsel and sua sponte giving a curative instruction. This Court will not address that issue further.

 [¶ 29] Reviewing the record as a whole, we do not find the remarks by the prosecutor to be so prejudicial as to deny Leyo a fair trial. The remarks at issue were presented in the context of commenting specifically about the obvious difficulties of Amanda Inman. The remarks concerning legislative policy were minimal when viewed in the totality of the prosecutor's closing remarks. Even in the remarks quoted, the prosecutor emphasized that it was the jury's responsibility to determine the credibility of Inman and weigh her testimony. The credibility of Inman was the overriding theme for the attorneys on both sides during their re-

spective closing arguments. The result was that the jury was made acutely aware that their verdict would hinge upon its determinations regarding the evidence produced at trial. Additionally, the trial judge instructed the jury several times that it must decide the case upon the evidence presented at trial. The trial judge specifically instructed the jurors that the statements and arguments of the attorneys are not evidence. Given this context, any potential error on the part of the prosecutor in closing argument does not rise to the level of plain error.

## CONCLUSION

[¶ 30] We find no trial error. The evidence was sufficient to prove the elements of delivery of a controlled substance and conspiracy to do the same. No plain error occurred during closing argument. Affirmed.