2018 WY 4

**Corey David GARRIOTT, Appellant (Defendant),**

v.

**The STATE of Wyoming Appellee (Plaintiff).**

**S-17-0097**

Supreme Court of Wyoming.

January 18, 2018

Representing Appellant: Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson *, Chief Appellate Counsel; Kirk Morgan, Senior Assistant Appellate Counsel; Argument by Ms. Olson.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Jesse B. Naiman, Assistant Attorney General. Argument by Mr. Naiman.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] Corey Garriott was convicted of one count of conspiracy to deliver methamphetamine. He appeals his conviction, claiming that the district court made numerous errors in the admission of testimony, and that it erred in denying his motion to dismiss on double jeopardy grounds. He further claims that plain error occurred when a law enforcement witness offered his opinion that Mr. Garriott committed the crime of conspiracy to deliver methamphetamine. We affirm.

## ISSUES

[¶2] Mr. Garriott presents three issues on appeal, which we state as:

I. Did the trial court err in admitting improper "overview" testimony, testimony regarding portions of the conspiracy in which Mr. Garriott had no involvement, and testimony regarding the addiction, substance abuse, and personal histories of Mr. Garriott's co-conspirators?

II. Did the trial court err in denying Mr. Garriott's motion to dismiss on double jeopardy grounds?

III. Did plain error occur when a state witness offered his opinion that Mr. Garriott committed the crime of conspiracy to deliver methamphetamine?

## FACTS

[¶3] In the fall of 2015, Pauline Hemicker began selling methamphetamine in Casper, Wyoming. Ms. Hemicker's original supplier was Joshua Coats, but around January 2016, Mr. Coats became unavailable because he was scheduled to begin serving a sentence at the Casper re-entry facility. Because Mr. Coats was going to be unavailable while serving his sentence, he made arrangements for Ms. Hemicker to obtain methamphetamine directly from his Colorado source, Chris Pino. As of January 2016, Ms. Hemicker therefore took over as Mr. Pino's distributor in Casper.

[¶4] Ms. Hemicker used multiple distributors to sell methamphetamine, but her main distributor was Mikey Ross, whom she met in November 2015. Around the end of January or the beginning of February 2016, Ms. Hemicker met Mr. Ross at home in his garage. Corey Garriott was also present, and Mr. Ross asked Ms. Hemicker if she had any work for Mr. Garriott.[1] Ms. Hemicker took

---

* An order granting Ms. Olson's Motion to Withdraw was entered on December 13, 2017.

1. Mr. Ross had introduced Ms. Hemicker to Mr. Garriott in November 2015, shortly after Ms. Hemicker met Mr. Ross. Mr. Ross made that

this to be a request for methamphetamine to distribute, because work was the slang term she, along with Mr. Ross and Mr. Garriott, used to refer to methamphetamine. Ms. Hemicker described that meeting:

Q. And who was present?

A. It was me, Mikey Ross, Corey. I think that's it.

Q. Okay. And, again, this would have been sometime the end of January, first of February you think?

A. Right.

Q. And so what happened at that meeting when he asked if you had any work for Corey?

A. I was iffy about it at first. I mean, I don't know. And then I—I don't know. Mikey said he trusted him. It was his boy. He said he would do the transactions, he would collect the money, and that I wouldn't have to deal with him one-on-one.

Q. Okay. And so how did you feel about that?

A. I was okay with it as long as it went through Mikey Ross.

[¶5] During that meeting in the garage, Ms. Hemicker supplied Mr. Ross with methamphetamine and instructed him that it was "totally up to him to distribute to whoever he did." On February 2, 2016, Mr. Ross sent Ms. Hemicker a text message, which stated, "Heh I got corys money for u," followed immediately by a message that he also had money for her. Ms. Hemicker understood the messages to refer to money for the methamphetamine she had supplied because that was the only thing for which either Mr. Ross or Mr. Garriott would owe her money.

[¶6] Ms. Hemicker described a number of occasions on which she supplied methamphetamine to Mr. Garriott or had discussions with him about supplying him with methamphetamine. Just a couple of days after the first occasion in Mr. Ross' garage, Ms. Hemicker again met Mr. Ross and Mr. Garriott at Mr. Ross' home. When Mr. Garriott left the

home, Ms. Hemicker followed him to the driveway and handed him an 8-ball of methamphetamine.[2] Thereafter, Ms. Hemicker started communicating directly with Mr. Garriott, and they exchanged several text messages relating to Ms. Hemicker's ability to supply Mr. Garriott with methamphetamine as well as money Mr. Garriott owed Ms. Hemicker.

[¶7] After being supplied by Ms. Hemicker, Mr. Garriott sold three grams of methamphetamine to a friend of his, Angela Danielson. Ms. Danielson described that transaction:

Q. Now, during this time period, let's say beginning of February of 2016, did you ever get any methamphetamine from anyone besides Mikey Ross?

A. Yeah.

Q. And who was that?

A. I got some from Corey once.

Q. And can you tell me what led to that.

A. What—what led to me getting it from him?

Q. Yeah.

A. We would text back and forth. I would—I would text him and ask for work; and whenever I would say that, I would mean I was looking for dope. And he text me out of the blue and said he had some, and I got it from him. That was that. It was one time, though.

[¶8] Mr. Garriott fronted Ms. Danielson the methamphetamine he supplied her, meaning that he in effect sold it to her on credit. Their understanding was Ms. Danielson would pay Mr. Garriott after she sold the methamphetamine. In the days following that transaction, Mr. Garriott and Ms. Danielson exchanged numerous text messages concerning Ms. Danielson's desire to be introduced to Ms. Hemicker, her requests for additional work from Mr. Garriott, and the money she owed him.

---

introduction because Mr. Garriott did tattoo work, and Ms. Hemicker was interested in getting a tattoo. Ms. Hemicker discussed having Mr. Garriott draw up a tattoo pattern for her at that time, but nothing came of it, and Ms. Hemicker never got a tattoo from Mr. Garriott.

**2.** An 8-ball is an eighth of an ounce of methamphetamine and is a common amount supplied for redistribution.

[¶9] During this same February 2016 time frame, Mr. Garriott was living with John Fry, a methamphetamine user, and he was also selling methamphetamine to Mr. Fry. On February 8, 2016, Mr. Garriott sent a text message to Ms. Hemicker asking that she meet with him and Mr. Fry. His message stated, "Hey when you get some free time will you meet one of my homies and hear a business plan." Ms. Hemicker agreed to the meeting and described what occurred:

Q. And when they got there, did they have some kind of business plan to propose to you?

A. Yes.

Q. And do you recall what that was? .

A. That was for me to tell them who I was distributing my methamphetamine to so that they can go and take it from them after I distributed to them.

Q. And when you say "take it from them," what—what do you mean?

A. Rob them.

* * *

Q. So what was the plan? What were they going to do with the methamphetamine once they took it?

A. They were just going to distribute it, just make double money off of it.

Q. And so when they told you that plan, what was your reaction?

A. I didn't think it was a good idea.· I denied them when they came to me for that business proposition.

[¶10] Some days after that meeting, Mr. Garriott, while at home with Mr. Fry, sent a text message to Ms. Hemicker "trying to set up a meeting for her to come over and basically broker a deal for some meth." Mr. Fry explained:

Q. And when you say "broker a deal for methamphetamine," what do you mean?

A. Well, Corey was basically meeting— having me meet Pauline so she could bring some meth.

Q. And what was going to happen with the meth that she brought?

A. It was going to be used and sold by myself and Corey.

Q. And up to this point, had you been selling methamphetamine?

A. No. I was just using.

Q. And so why at this point—why were you going to get into selling?

A. I was having a real hard time financially. I was laid off from the oil field.

[¶11] That same evening, Ms. Hemicker and her husband came to Mr. Fry's home. Mr. Fry again explained:

Q. And, again, do you know how the meeting was set up? So you didn't have Ms. Hemicker's contact information, so—

A. No, ma'am. Corey—Corey contacted her. And—and then they both ended up coming over. He came back over, and she showed up right after.

Q. And so who all was at this meeting?

A. Myself; Corey Garriott; Pauline; and Uwe, her husband.

Q. And what happened at that meeting?

A. She came over. We used some meth, and we talked about—I talked about buying some meth from her. And I ended up buying some.

Q. And do you recall how much you purchased that night?

A. It would have been an ounce.

Q. And do you remember what you were being charged for that?

A. I believe it was—I think it was about $900.

Q. And how—did you pay for that that evening?

A. Yes; most of it.

Q. Okay. Do you recall how much exactly?

A. About $600.

Q. And so where—how—what was the arrangement, then, for the rest of the money for that?

A. She was going to come back and get it.

Q. And where were you going to come up with that money?

A. Selling methamphetamines.

Q. And so did you end up selling that methamphetamine?

A. Yes.

Q. And did you return that money to Ms. Hemicker?

A. I did.

Q. And after this initial meeting that Mr. Garriott set up, how were you and Ms. Hemicker communicating?

A. By telephone, texting, also Corey.

Q. Okay. So there—you were still doing some communicating through Mr. Garriott?

A. Yes, ma'am.

[¶12] Ms. Hemicker also continued to supply Mr. Garriott with methamphetamine, including on February 12 and 17, and March 13, 2016. On March 19, 2016, Mr. Garriott sent Ms. Hemicker a text message telling her that Angela Danielson wanted to spend $1,200, and asking if she could work with that. Ms. Hemicker understood that to be a request for about two ounces of methamphetamine, but because she did not have that amount, nothing came of that request. On March 20, 2016, Mr. Garriott again contacted Ms. Hemicker and told her "I really could use seeing you." Ms. Hemicker again understood this to mean Mr. Garriott needed methamphetamine.

[¶13] Ms. Hemicker responded to Mr. Garriott's March 20 text message with a request that Mr. Garriott come to her home and change the tires on her vehicle, which he agreed to do. Ms. Hemicker informed Mr. Garriott that she needed new tires because she was traveling to Cheyenne to obtain methamphetamine.

Q. And what did you tell him?

A. I told him—he knew that I had to go to Cheyenne to re-up. So that was the whole reason I needed my tires changed.

Q. Okay. Did you discuss with him the text that he wanted some help and that you didn't have anything, but that's what you were going to do?

A. Right.

Q. And was there any discussion—was he going to get anything in return for helping you change your tires?

A. He didn't ask for anything in return.

Q. Okay. Were you—did you think you might give him something in return?

A. Of course I would have.

Q. And what were you planning—

A. I would have just gave him some methamphetamine.

Q. And you knew that's what he was looking for?

A. Right.

Q. So what happened after your tires were changed?

A. Then I asked him if he wanted to go with me to Cheyenne. And he said, Well, follow me to my sister's. I have to drop the car off. So I followed him over there and we dropped the car off and we left and got gas and went to Cheyenne.

[¶14] Ms. Hemicker and Mr. Garriott drove to a Motel 6 in Cheyenne, where they were to meet with Danny Thompson, who was sent by Chris Pino. Four persons met in the motel room: Ms. Hemicker, Mr. Garriott, Mr. Thompson, and a friend of Mr. Thompson's. Mr. Thompson gave Ms. Hemicker the methamphetamine, and she and Mr. Thompson smoked some of it. The four then left the motel, went to Mr. Thompson's friend's house, and talked for a little while. Ms. Hemicker and Mr. Garriott thereafter headed back to Casper.

[¶15] On their way back, Ms. Hemicker and Mr. Garriott stopped in Douglas to pick up some speakers for Mr. Garriott. After leaving Douglas, Ms. Hemicker was pulled over at some point between Douglas and Casper by the Wyoming Highway Patrol, accompanied by Division of Criminal Investigation (DCI) agents.[3] They seized two packages of methamphetamine, one weighing 107.674 grams, and the other 67.121 grams.

[¶16] On March 22, 2016, the State filed an information charging Mr. Garriott with one count of conspiracy to deliver methamphetamine. His first trial, which began on September 19, 2016, ended in a mistrial on September 20 on Mr. Garriott's motion. Mr.

3. DCI was able to intercept Ms. Hemicker while transporting the methamphetamine because after Mr. Fry's second purchase of methamphetamine from Ms. Hemicker, which was about two ounces, he had a change of heart and turned himself and the methamphetamine in to law enforcement. At that point, Mr. Fry became a DCI confidential informant and kept DCI informed of Ms. Hemicker's plans, including the March 20 Cheyenne trip to purchase methamphetamine.

Garriott requested the mistrial after Mr. Fry testified in response to questions by the prosecutor that he met Mr. Garriott in prison. The district court agreed that the testimony was unfairly prejudicial to Mr. Garriott and granted the defense motion for a mistrial.

[¶17] The district court thereafter set Mr. Garriott's second trial for October 31, 2016. On October 17, 2016, Mr. Garriott requested permission to represent himself in that second trial after firing his fourth public defender. On October 21, 2016, the district court held a hearing on Mr. Garriott's request and ruled that he would be permitted to represent himself.

[¶18] Before withdrawing from representing Mr. Garriott, his fourth and final public defender filed a motion to dismiss based on Fifth Amendment double jeopardy protections. On October 27, 2016, the district court heard the motion, made a finding that the State did not intentionally goad Mr. Garriott into requesting a mistrial, and denied the motion to dismiss.

[¶19] The second trial began on October 31, 2016 and concluded on November 2, 2016, with the jury returning a verdict finding Mr. Garriott guilty of conspiracy to deliver a controlled substance, methamphetamine. On January 31, 2017, the district court entered an order sentencing Mr. Garriott to a prison term of five to seven years. On February 2, 2017, Mr. Garriott filed a timely notice of appeal to this Court.

## DISCUSSION

### I. Alleged Errors in the Admission of Testimony

■ [¶20] In his first argument, Mr. Garriott contends that the district court erred in: A) allowing overview testimony by DCI Agent Brad Reinhart; B) allowing witness testimony concerning portions of the conspiracy in which Mr. Garriott had no involvement; and C) allowing co-conspirator testimony that included the co-conspirators' personal histories and addiction issues. To the extent Mr. Garriott preserved his objection to these asserted errors in the admission of evidence, we will review the district court's decision for an abuse of discretion:

"We review claimed error concerning the improper admission of evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse." *Szymanski v. State*, 2007 WY 139, ¶ 15, 166 P.3d 879, 883 (Wyo. 2007) (citing *Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206 (Wyo. 2007)). "A trial court abuses its discretion when it could not have reasonably concluded as it did. In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *Id.* (internal citation omitted). Upon a finding of abuse of discretion, we must then determine whether the error was prejudicial. "'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.'" *Mersereau v. State*, 2012 WY 125, ¶ 17, 286 P.3d 97, 106 (Wyo. 2012) (quoting *Rolle v. State*, 2010 WY 100, ¶ 9, 236 P.3d 259, 264 (Wyo. 2010)).

*Schmidt v. State*, 2017 WY 101, ¶ 22, 401 P.3d 868, 878 (Wyo. 2017) (quoting *Toth v. State*, 2015 WY 86A, ¶ 29, 353 P.3d 696, 705-06 (Wyo. 2015)).

■ [¶21] For any alleged errors in the admission of testimony to which Mr. Garriott did not object, we limit our review to a search for plain error. *Hathaway v. State*, 2017 WY 92, ¶ 29, 399 P.3d 625, 634 (Wyo. 2017). "Under the plain error standard of review, we reverse a district court's decision only if it is so plainly erroneous that the judge should have noticed and corrected the mistake even though the parties failed to raise the issue." *Town v. State*, 2015 WY 78, ¶ 9, 351 P.3d 257, 260 (Wyo. 2015) (quoting *Masias v. State*, 2010 WY 81, ¶ 20, 233 P.3d 944, 950 (Wyo. 2010)). Plain error exists when:

(1) the record clearly reflects the alleged error; (2) the party claiming the error demonstrates a violation of a clear and unequivocal rule of law; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice.

*Hathaway*, ¶ 29, 399 P.3d at 634 (quoting *Griggs v. State*, 2016 WY 16, ¶ 81, 367 P.3d 1108, 1132-33 (Wyo. 2016)).

[¶22] Against these standards of review, we will separately consider each of Mr. Garriott's asserted errors in the district court's admission of testimony.

## A. Agent Reinhart's Testimony

[¶23] Mr. Garriott contends Agent Reinhart's testimony was improper overview testimony that should have been excluded because it impermissibly vouched for the credibility of the State's witnesses and placed the State's imprimatur on witness testimony. We disagree.

[¶24] We begin with the definition of overview testimony, which as the Tenth Circuit Court of Appeals has observed, is different from opinion testimony.

Opinion and overview testimony are related but slightly different types of evidence. Under Federal Rule of Evidence 701, lay opinion testimony must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Under Rule 702, expert opinion testimony is allowed if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

Overview testimony is a broader category of evidence, usually offered at the beginning of trial by a government agent as a way to preview the government's case, and can include lay and expert opinion. It occurs when a "witness is put on the stand to testify before there has been any evidence admitted for the witness to summarize." *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003). The testimony provides "an overview of the government's case, setting forth for the jury the script of the testimony and evidence the jury could expect the government to present in its case-in-chief." *United States v. Moore*, 651 F.3d 30, 54-55 (D.C.Cir. 2011).

*United States v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2013).

[¶25] "Courts generally allow overview testimony to the extent it concerns how an investigation began, the law enforcement agencies involved, or the investigative techniques used." *Id.* It is also admissible as expert testimony to show the roles played by participants in a criminal enterprise. *Id.* at 931 (quoting *United States v. McSwain*, 197 F.3d 472, 482 (10th Cir. 1999)). While overview testimony may be admissible in certain circumstances, its parameters must be carefully drawn.

But overview testimony is susceptible to abuse. It can stray into matters that are reserved for the jury, such as opinions about a defendant's guilt or a witness's credibility. An overview witness, for example, might express opinions about the defendant's truthfulness at certain times or his likelihood of being involved in a scheme or crime, thus usurping the jury's role in making fact findings based on the credibility and demeanor of witnesses with personal knowledge. Other potential problems include the government's ability (1) to spin the evidence in its favor before it is admitted (assuming it is ever admitted), (2) to give its official imprimatur to certain evidence, and (3) to allow its witnesses (usually law enforcement) to testify on matters about which they have no personal knowledge or that are based on hearsay. *See* [*United States v.*] *Moore*, 651 F.3d [30,] at 56 [ (D.C. Cir. 2011) ]. As one court put it,

[S]uch testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence. There is also the possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story. Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.

*United States v. Casas*, 356 F.3d 104, 119-20 (1st Cir. 2004) (citations omitted).

*Brooks*, 736 F.3d at 930-31.

[¶26] We now turn to Mr. Garriott's claim that Agent Reinhart's testimony was

improper overview testimony. Before we consider the claim, however, we must determine the proper standard for our review. That question is complicated by the fact that on appeal Mr. Garriott claims error in essentially the entirety of Agent Reinhart's testimony, but at trial, he objected only twice during that testimony. This is important because we have held that until a trial court makes a definitive ruling on the admissibility of evidence, a party must continue to renew his objection to preserve that objection. *Hicks v. Zondag*, 2014 WY 16, ¶ 13, 317 P.3d 606, 609-10 (Wyo. 2014). In requiring that a party renew his objection to preserve it, we have explained:

> [A] party seeking to exclude evidence does not have to renew the objection at trial if the court entered a definitive ruling at an earlier time, but the objection does have to be renewed if the trial court refused to rule on the earlier occasion, or deferred ruling, or entered a nonfinal or provisional or conditional ruling indicating that the matter remains open. The amended language in [F.R.E.] 103(b) actually reaches beyond pretrial motions, and applies to definitive on-the-record rulings that are made at any time during the course of the proceedings.
>
> * * *
>
> The requirement that the ruling be "definitive" is clearly satisfied if the trial judge rules in an unequivocal manner, without reserving the matter for further consideration as the trial progresses and the evidence unfolds.

*Hicks*, ¶ 13, 317 P.3d at 609-10 (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 1:10 (4th ed. 2013) (footnotes omitted)); *see also Garland v. State*, 2017 WY 102, ¶ 17, 401 P.3d 480, 485 (Wyo. 2017).

[¶27] It is apparent that the district court did not at any point make a definitive ruling

on Agent Reinhart's testimony. Before Mr. Garriott made his request to appear *pro se* at his second trial, his attorney filed a pretrial motion in limine to exclude overview testimony, basing that motion on testimony that had been allowed in the first trial from a different DCI agent, Agent Cox. The district court ruled:

> My recollection of Agent Cox's testimony is similar to what [the State] has stated. It was kind of an overview as an expert to assist the jury in understanding [the] kind of the logistics of how people who distribute controlled substances operate and to understand kind of the concepts of that as they could become relevant based on the specific testimony from other witnesses about this particular case. . . . I don't know that anything that Agent Cox testified to really implicated the focus of what [defense counsel] was arguing as far as the specifics of this particular case. At this time, there's not a basis in limine before the trial to rule and exclude something along those lines. If there's an objection to something that's actually presented in the retrial, the Court would consider that objection at the appropriate time.

[¶28] The district court's ruling on the defense motion in limine was clearly not a final ruling, and it instead invited Mr. Garriott to object as evidence was presented during the trial. At trial, Mr. Garriott objected on only two occasions during Agent Reinhart's direct examination, and on both occasions, the district court ruled, "I'll overrule at this time." Neither of these rulings was an unequivocal ruling on the admissibility of Agent Reinhart's testimony in its entirety. This leaves us with preserved objections to only part of the testimony.[4] Accordingly, we will review the testimony to which Mr. Garriott objected for an abuse of discretion, and

---

4. As a *pro se* litigant, Mr. Garriott likely did not understand the need to renew his objection and no doubt intended a broader and continuing objection to Agent Reinhart's testimony. That does not, however, change our application of the law. While courts afford *pro se* litigants some leniency, we still require compliance with our rules. *Williams v. Tharp*, 2017 WY 8, ¶ 9, 388 P.3d 513,

516 (Wyo. 2017) ("Courts make some allowances for *pro se* litigants, but neither this Court nor the district court is obligated to frame the issues for the parties . . . ."); *RM v. State*, 957 P.2d 296, 298 (Wyo. 1998) ("We remain committed to the rule that this Court will not apply different procedural standards for *pro se* parties than we do for represented parties.").

the remaining testimony for plain error.[5]

## 1. Review for Abuse of Discretion

[¶29] Mr. Garriott objected to two questions that were asked of Agent Reinhart. His first objection occurred as follows:

Q. ... [Y]ou talked a little bit about the different aspects of the drug organization or the different roles that people can play in that—in that distribution. Can you explain a little bit more in detail about each individual roles of the organization?

A. Yes. Throughout the organization, you have different levels, as I've said. Some of the individual's sole purpose is transporting the drugs; while others, their job might just to be a stash house or a hide house to hold those drugs at until they can move on to the next stage of the operation. Each individual in these organizations has a— they have a job. They have a purpose to this to further the overall conspiracy. And it—it goes down to even individuals that their sole purpose is to drive or even act as a passenger in a vehicle, just helping them—

MR. GARRIOTT: Objection, Your Honor.

THE COURT: What's the basis for your objection?

MR. GARRIOTT: That he's trying to give an overview on the whole drug conspiracy, that it does not pertain to me, where the drugs come from Mexico and the transporter of the drugs and this and that. It's the overview. He's trying to give a generalization that this individual case is more broad than it actually is.

THE COURT: [Prosecutor]?

[PROSECUTOR]: Your Honor, Agent Reinhart is giving some basic background information of the different roles of an organization and how they rely on each other to further the conspiracy.

THE COURT: I'll overrule at this time.

[¶30] Mr. Garriott's second objection then occurred as follows:

Q. Throughout your training and experience, have you had an opportunity to review, like, text messages or phone calls that are made during a methamphetamine distribution?

A. Yes, ma'am. Throughout my six years of working narcotics, I've reviewed hundreds of phones and text message downloads, and—in regards to these kinds of investigations.

Q. And in your experience, do you—

MR. GARRIOTT: Objection, Your Honor.

THE COURT: Just a moment. Finish the question, then I'll come back to you, sir.

Q. In your experience, how often have you seen the words "drugs" or "methamphetamine" actually used?

THE COURT: Just a second.

MR. GARRIOTT: I object to this because it's been 15 minutes and there is still no basis upon my position in this conspiracy.

THE COURT: All right. I'll overrule at this time.

[¶31] Mr. Garriott's objection to Agent Reinhart's above-quoted testimony as impermissible overview evidence is misplaced. The testimony was not a preview or script of the State's case, but was instead testimony concerning drug organizations generally, and the roles and communication within those organizations. This was not expert testimony aimed at previewing the State's case, but rather at assisting the jury in evaluating the evidence.[6]

---

**5.** Overview testimony is the type of evidence that highlights the need for a defendant to renew his objection. As we indicated above, overview testimony is not favored because of its potential for abuse, but we have announced no blanket prohibition on its admission. It may therefore be difficult for a trial court in many cases to make a definitive ruling on such testimony as a whole, and it is incumbent on the defendant to renew his objection when such testimony exceeds its permissible use and strays into an area of concern.

**6.** The State's direct examination of Agent Reinhart began with his background and then the following to which no objection was made:

Q. And through your training and experience, have you gained knowledge that the average American does not know?
A. Yes, ma'am, I have.
Q. And do you think that information would be helpful to the jury?
A. Very much so.

[¶32] Such expert testimony is generally admissible if it will assist the trier of fact in resolving the factual issues before it. *Cureton v. State*, 2007 WY 168, ¶ 10, 169 P.3d 549, 551 (Wyo. 2007); *see also United States v. Vann*, 776 F.3d 746, 758 (10th Cir. 2015) (quoting *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014)) (police officers may testify as experts based on their experience including testimony on the "means and methods of drug dealing"); Barbara E. Bergman et al., 3 *Wharton's Criminal Evidence* § 13:63 (15th ed. Nov. 2017 update) (footnote omitted) ("Courts often permit prosecutors to qualify police officers as experts to testify about a variety of issues in criminal cases, including drug related activities . . . ."); 31A Am. Jur. 2d *Expert and Opinion Evidence* § 311 (Nov. 2017 update) (footnote omitted) ("Expert testimony as to modus operandi in cases involving drug-related offenses has been widely accepted."). For example, in *Cureton*, we affirmed the trial court's decision to admit an investigating officer's expert testimony on the distinguishing factors between methamphetamine possessed for personal use and that possessed for resale.

At trial, in addition to testifying about the events surrounding Cureton's arrest and the items seized, Officer Wenberg testified as an expert with over sixteen years of experience about the common characteristics of methamphetamine use and trafficking, including its different forms and methods of ingestion, the various quantities in which the drug is sold and its street value. Officer Wenberg testified that most people who sell methamphetamine often use it, and that a large quantity of the drug, as found in this case, could be possessed for either personal use or for resale. Officer Wenberg stated that, in order to determine if a person intended to resell methamphetamine, one had to consider other factors such as the presence of packaging materials, scales, large amounts of cash or other items of value, and pay/owe sheets upon which drug transactions are recorded. Officer Wenberg opined that the presence of several factors suggested that methamphetamine was being sold.

*Cureton*, ¶ 8, 169 P.3d at 551.

[¶33] In finding this testimony relevant and admissible, we explained:

In this case, Officer Wenberg never testified or offered a conclusion about whether Cureton was a drug dealer or that she was guilty of any particular offense. The officer's testimony merely informed the jury about the meaning and significance of certain items of physical evidence collected at the scene, and left the ultimate conclusion for the jury. We do not perceive Officer Wenberg's testimony as impermissible comments on Cureton's guilt but, rather, as opinion evidence offered to aid the jury in understanding and resolving the factual issues of the case.

*Id.* ¶ 11, 169 P.3d at 551.

[¶34] We view Agent Reinhart's testimony in much the same way. While not every role Agent Reinhart included in his general drug organization description was reflected in the organization within which Mr. Garriott operated, the information was generally helpful in understanding drug distribution operations and the interrelationships of the different roles. Similarly, Agent Reinhart's testimony describing drug dealing terminology used in text messages was helpful to the jury in understanding text messages between Mr. Garriott and his co-conspirators.

[¶35] Rather than offering a preview of the State's case, and what to expect from the State's evidence, Agent Reinhart provided generalized expert testimony on drug organizations, including individual roles in such organizations and communications between participants in those organizations. As we held in *Cureton*, this is within the bounds of permissible expert testimony, and we thus find no abuse of discretion in the district court's decision to allow the testimony.[7]

[¶36] We turn then to our review of Agent Reinhart's remaining testimony for plain error.

---

7. It is not clear from the record whether the State formally designated Agent Reinhart as an expert witness, but Mr. Garriott made no objection to the testimony as expert testimony or to Agent Reinhart's qualifications as an expert, so we need not address that question.

## 2.  Review for Plain Error

[¶37] Mr. Garriott generally challenges all of Agent Reinhart's direct examination testimony as improper overview testimony. We reach the same conclusion for the testimony to which Mr. Garriott did not object on direct examination as we did for the two questions to which Mr. Garriott did object. Agent Reinhart's direct examination testimony simply was not overview testimony, and we can therefore find no plain error in the district court's admission of the testimony on that ground.

[¶38] Moreover, to the extent Mr. Garriott argues that the admission of Agent Reinhart's testimony violated W.R.E. 403 because its potential for unfair prejudice outweighed its relevance, we again find no plain error. As we discussed above, Agent Reinhart's testimony concerning drug distribution rings, and the means and methods of such operations, was helpful to the jury in evaluating the evidence before it and was thus relevant. As to Agent Reinhart's testimony that methamphetamine sold in Wyoming originates in Mexico, testimony Mr. Garriott points to as irrelevant, we again find no plain error. In context, the testimony was offered to explain the importance of local drug distribution networks when the product originates outside Wyoming. The State did not dwell on the Mexico connection, and Mr. Garriott points to nothing in the record that would suggest that the State was using the testimony to play on juror passions. We thus find no plain error violation of W.R.E. 403 in Agent Reinhart's direct examination testimony.

[¶39] Mr. Garriott next contends that Agent Reinhart responded in an improper fashion to several questions on cross-examination, and that those responses amounted to additional overview testimony which impermissibly vouched for the State's witnesses who would testify later in the trial. Specifically, Mr. Garriott points to the following testimony:

Q. ... Specifically to me, did you ever do any surveillance on me?

A. At this point, on just you, no; but on other individuals in your organization, yes, sir.

Q. So did you ever hear of any controlled purchases or hidden cameras or video surveillance or anything on my—on me as an individual?

A. Just for you, no; but Ms. Hemicker, yes.

* * *

Q. ... You do wiretaps, video surveillance, even hang cameras from trees and poles, and you never once had a picture of me or surveillance of me on any of this?

A. In this investigation, no; but I've done other—

Q. No, no. I'm talking about this investigation, this conspiracy specifically.

A. No, we had no photos of you, but we had multiple people talking about you.

[¶40] We again do not see this as overview testimony. Agent Reinhart did not preview the State's case and instead merely testified to his own personal knowledge of the investigation. Additionally, even if Agent Reinhart's testimony could be viewed as overview testimony, the testimony did not impermissibly vouch for the credibility of other prosecution witnesses.

[¶41] Our law is clear that "it is the jury's role to determine the credibility of witnesses." *Fennell v. State*, 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015) (citing *Ogden v. State*, 2001 WY 109, ¶ 21, 34 P.3d 271, 276 (Wyo. 2001)). We have explained:

Generally, one witness may not testify as to another witness' credibility. The purpose of this rule is to preserve the integrity of the jury process by protecting the jury's right to act as the final determiner of the credibility of the witnesses. We have stated, however, that a trial court does not necessarily commit plain error when it allows testimony which illuminates some aspect of the case even though the testimony incidentally bolsters the credibility of another witness.

*Bolin v. State*, 2006 WY 77, ¶ 16, 137 P.3d 136, 143 (Wyo. 2006) (quoting *Strickland v. State*, 2004 WY 91, ¶ 22, 94 P.3d 1034, 1045-46 (Wyo. 2004)).

[¶42] In *Bolin*, we found no plain error in a detective's testimony that his informant was forthcoming in disclosing his prior conviction

and he felt he could trust the informant based on that disclosure. *Bolin*, ¶ 15, 137 P.3d at 142. We reasoned:

> Detective Harper did not state he believed the informant was credible or encroach on the jury's right to determine his credibility. Any incidental effect the testimony may have had to bolster the informant's credibility was not plain error.

*Id.* ¶ 18, 137 P.3d at 143.

[¶43] We conclude the same with respect to Agent Reinhart's testimony. He did not testify that he found Ms. Hemicker or any other witness credible, or even trustworthy. Any effect his testimony may have had on witness credibility was purely incidental and is not plain error.

### B. Pauline Hemicker Testimony

[¶44] Mr. Garriott next contends the district court erred in allowing Pauline Hemicker to testify concerning her drug distribution activities that predated Mr. Garriott's involvement in the conspiracy. Mr. Garriott made general relevance objections twice during the cited portion of Ms. Hemicker's testimony, but most of the testimony he now challenges on appeal came in without objection. We will therefore review the testimony for plain error.

[¶45] The first element of the plain error test is satisfied because the challenged testimony is reflected in the record. With respect to the second element, we find no violation of a clear and unequivocal rule.

[¶46] "When evidence forms part of the history of the event or serves to enhance the natural development of the facts, it is admissible as long as its probative value outweighs its prejudicial effect." *Bolin*, ¶ 14, 137 P.3d at 142 (citing *Williams v. State*, 2004 WY 117, ¶ 11, 99 P.3d 432, 439 (Wyo. 2004)). As to its probative value, the evidence relating to Ms. Hemicker's earlier trips to obtain methamphetamine was relevant to establish a course of conduct showing that the co-conspirators, eventually including Mr. Garriott, intended that large quantities of methamphetamine would be obtained for local distribution in smaller quantities. *See Ekholm v. State*, 2004 WY 159, ¶ 22, 102 P.3d

201, 208 (Wyo. 2004) (quoting *Martinez v. State*, 943 P.2d 1178, 1183 (Wyo. 1997)) ("[I]t is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'"). The fact that Ms. Hemicker's earliest trips to obtain methamphetamine occurred prior to Mr. Garriott's involvement in the scheme does not undermine their relevance.

Generally speaking, a defendant who joins an ongoing conspiracy may be held accountable—for purposes of determining the scope of liability for the conspiracy charge itself—with the acts or statements of coconspirators that occurred prior to his entry into the conspiracy, if those acts or statements were in furtherance of the conspiracy. *See United States v. Coleman*, 7 F.3d 1500, 1503 (10th Cir. 1993) ("It is fundamental that a party may join an ongoing conspiracy during its progress and become criminally liable for all acts done in furtherance of the scheme." (internal quotation marks omitted)); *United States v. Blackthorne*, 378 F.3d 449, 454 (5th Cir. 2004) ("[O]ne who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators, made after the formation and in furtherance of the conspiracy." (internal quotation marks omitted)); *United States v. David*, 940 F.2d 722, 735 (1st Cir. 1991) ("When, as here, a miscreant opts to join an ongoing conspiracy, the law holds him accountable for the earlier acts of his coconspirators in furtherance of the conspiracy."). We discern no reason why this principle does not apply to the prior overt acts of coconspirators that establish the basis for venue and so hold. *See United States v. Davis*, 666 F.2d 195, 200 (Former 5th Cir. 1982) (rejecting defendant's argument that "she was improperly tried in Georgia because the government did not prove that she joined the conspiracy before [her coconspirator and an undercover agent] arrived in Florida," stating that "[s]ince the prior actions of coconspirators in furtherance of the conspiracy are attributable to one who later joins the conspiracy," that conduct of a coconspirator involving the Georgia trial district, although predating

her entry into the conspiracy, was "attributable" to her).

*United States v. Hamilton*, 587 F.3d 1199, 1207-08 (10th Cir. 2009) (footnote omitted).

[¶47] Consistent with this approach we have held that "it is not necessary to a charge of conspiracy that the defendant actively participate in the substantive crime which is the object of the conspiracy." *Ekholm*, ¶ 24, 102 P.3d at 209 (quoting *McLaughlin v. State*, 626 P.2d 63, 66 (Wyo. 1981)).

A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-254, 60 S.Ct. 811, 858-859, 84 L.Ed. 1129 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. *See Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183–1184, 90 L.Ed. 1489 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." *United States v. Holte*, 236 U.S. 140, 144, 35 S.Ct. 271, 272, 59 L.Ed. 504 (1915). A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense. *United States v. Rabinowich*, 238 U.S. 78, 86, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915).

*Ekholm*, ¶ 24, 102 P.3d at 209 (quoting *Salinas v. United States*, 522 U.S. 52, 63-65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)).

[¶48] Plainly, the challenged testimony was relevant. We further conclude that the probative value of the testimony outweighed any unfair prejudice that might arise from it. None of Ms. Hemicker's activities that predated Mr. Garriott's involvement in the conspiracy were markedly worse than the activities that occurred after Mr. Garriott became involved. Ms. Hemicker continued to obtain large quantities of methamphetamine, use methamphetamine, and distribute the methamphetamine using lower level distributors such as Mr. Garriott. The challenged testimony was relevant and not unfairly prejudicial, and we therefore find no plain error in its admission. *See also United States v. Ramsey*, 510 Fed.Appx. 731, 734-35 (10th Cir. 2013) (rejecting argument by low-level member of conspiracy that his right to a fair trial was prejudiced by evidence that one coconspirator attempted to murder an informant and other coconspirators sold heroin that resulted in the death of two users).[8]

### C. Testimony of Co-Conspirators Regarding Personal Histories and Addictions

[¶49] Mr. Garriott next contends the district court committed plain error in allowing his co-conspirators to testify concerning their histories of drug abuse, addictions, and criminal convictions. He argues the evidence was admitted in violation of W.R.E. 403 because the testimony was irrelevant and unfairly prejudiced him by playing on juror emotions concerning methamphetamine use in the community. We again disagree.

[¶50] The first element of the plain error test is met because the record reflects the challenged testimony by Ms. Hemicker, Mr. Fry, and Ms. Danielson. With respect to the second element of our plain error test, however, we conclude the evidence is relevant and not unfairly prejudicial, and that it thus did not violate a clear and unequivocal rule of law.

[¶51] First, as to the criminal histories of the co-conspirators, Mr. Garriott's motion in limine seeking to exclude overview

---

8. We do not intend with our holding to suggest a defendant may be held liable for substantive crimes committed by co-conspirators prior to the defendant's entry in the conspiracy. The law is clear that "an individual cannot be held criminally liable for substantive offenses committed by

members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy." *Hamilton*, 587 F.3d at 1207 n.5 (quoting *Glazerman v. United States*, 421 F.2d 547, 551 (10th Cir. 1970)).

testimony objected to vouching that he argued was intended "to make up for the sketchy nature of the State's other alleged co-conspirator witnesses." It is not surprising, therefore, that the State might seek to soften the impact of its witnesses' criminal histories by confronting them on direct examination in the context of the witnesses' addiction issues. Additionally, as we noted above, evidence that forms part of the history of the event or serves to enhance the natural development of the facts is admissible as long as its probative value outweighs its prejudicial effect. *Bolin*, ¶ 14, 137 P.3d at 142. The co-conspirator testimony regarding personal drug abuse and addictions provided an explanation of how each of these participants came to be involved in the alleged drug distribution ring. For these reasons, the testimony was relevant.

[¶52] Turning to the testimony's potential for unfair prejudice, we do not find it in this case. It was a minor part of each witness' testimony, and the State did not cite to or argue the personal addiction histories of its witnesses to draw on juror passions or outrage at the community impact of methamphetamine. Instead, it is clear that any reference to those histories was for the legitimate reason of explaining how the co-conspirators came to be involved in the delivery conspiracy. Thus, while testimony of this nature may have potential for unfair prejudice, that potential was not realized in this case. We therefore find no plain error in the district court's admission of the testimony.

## II.  Double Jeopardy Claim

[¶53] Mr. Garriott next contends that the district court erred in denying his motion to dismiss based on his Fifth Amendment double jeopardy protections. We review this claim as follows:

This Court reviews alleged violations of constitutional rights *de novo*. *Montoya v. State*, 2016 WY 127, ¶ 6, 386 P.3d 344, 346 (Wyo. 2016). However, we defer to the district court's findings of fact underlying its determination unless they are clearly erroneous. *Daniel v. State*, 2008 WY 87, ¶ 14, 189 P.3d 859, 864 (Wyo. 2008); *United States v. Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) ("In a double jeopardy goading case, we review the factual findings underlying a trial court's determination for clear error."). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Daniel*, ¶ 14, 189 P.3d at 864.

*King v. State*, 2017 WY 129, ¶ 9, 403 P.3d 1070, 1073 (Wyo. 2017).

[¶54] The Fifth Amendment to the United States Constitution provides three double jeopardy protections: "1) protection against a second prosecution for the same offense following an acquittal; 2) protection against a second prosecution for the same offense after a conviction; and 3) protection against multiple punishments for the same offense." *King*, ¶ 11, 403 P.3d at 1073-74 (quoting *Montoya v. State*, 2016 WY 127, ¶ 7, 386 P.3d 344, 347 (Wyo. 2016)). As a general rule, "a prosecutor is entitled to only one opportunity to require a defendant to stand trial." *King*, ¶ 12, 403 P.3d at 1074 (citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978)). This is so because

if the first trial is not completed, a second prosecution may be grossly unfair, it increases the financial and emotional burden on the defendant, extends the period in which the defendant is stigmatized by an unresolved criminal proceeding, and may increase the risk that an innocent defendant may be convicted.

*King*, ¶ 12, 403 P.3d at 1074 (citing *Washington*, 434 U.S. at 503-04, 98 S.Ct. at 829-30).

[¶55] A retrial is not, however, automatically barred when a trial terminates before resolution of the charges against the defendant. *King*, ¶ 13, 403 P.3d at 1074. When it is the defendant who has elected to terminate the proceedings, a retrial is barred only if "the prosecutor provoked or goaded the defendant into moving for a mistrial." *Id.* ¶ 14, 403 P.3d at 1074 (citing *Oregon v. Kennedy*, 456 U.S. 667, 676, 679, 102 S.Ct. 2083, 2089, 2091, 72 L.Ed.2d 416 (1982)). "Carelessness or mistake on the part of the prosecution . . . . is not sufficient to bar retrial under

the Double Jeopardy Clause." *Montoya*, ¶ 8, 386 P.3d at 347 (quoting *United States v. Powell*, 982 F.2d 1422, 1429 (10th Cir. 1992)) (ellipses in original).

[¶56] Mr. Garriott's first trial resulted in a mistrial after the following testimony by John Fry during the prosecutor's direct examination of him:

Q. So do you know the defendant, Corey Garriott?

A. I do.

Q. And how do you know him?

A. We met when we were in prison.

[Defense Counsel]: I'm going to object to that, Your Honor. And I would ask that it be stricken for obvious reasons.

[Prosecutor]: No objection, Your Honor.

HE COURT: Sustained. The jury will disregard the answer.

\* \* \*

Q. And so you stated you thought you met sometime around 2004?

A. 2005.

Q. 2005?

A. Yes, ma'am.

Q. And then have you been in contact with him all these years?

A. I have not. We actually—when I met him in 2005, we actually got out of prison together.

[Defense Counsel]: Same objection, Your Honor. I'm going to have a motion about this.

THE COURT: Sustained.

[¶57] During the next recess following Mr. Fry's testimony, Mr. Garriott moved for a mistrial. In opposing that motion, the prosecutor reported that she had instructed Mr. Fry to not discuss knowing Mr. Garriott from prison, and she generally argued against the motion. Defense counsel responded with additional argument and then stated, "I'll concede [the prosecutor] is an ethical prosecutor, did not seek to immediately go exploit and move on into this matter further . . . ." The district court accepted the prosecutor's representation that she had instructed Mr. Fry as she reported but concluded the unfair prejudice caused by Mr. Fry's

testimony required granting Mr. Garriott's motion for a mistrial.

[¶58] Following the mistrial, Mr. Garriott filed a motion to dismiss the charges against him, arguing that retrial was barred by his Fifth Amendment double jeopardy protections. In that motion, Mr. Garriott asserted that "Defendant is not—and never has—alleged intentional misconduct by counsel for the State." He further asserted that what must have happened was "simple negligence or a mistake" by counsel for the State. The district court denied the motion to dismiss, finding:

[O]nly where the governmental conduct in question is intended to goad the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion. The Court found at the time that the State did not intentionally cause the mistrial in the sense that the State did not intentionally elicit that testimony. In fact, [the prosecutor] represented on the record that she had instructed the witness not to testify about the things he testified to that led to the mistrial. There would have, based on the record and the totality of the record that I have before me, been no benefit to the State to have a mistrial declared under those circumstances.

[¶59] The record contains no evidence on which we can say that the district court's findings were clearly erroneous. The prosecutor's question to Mr. Fry, inquiring how he knew Mr. Garriott, was certainly asked without the care that was due, given the history Mr. Garriott and Mr. Fry shared. Still, because Mr. Fry and Mr. Garriott lived together for a time, we assume that may have been the answer the prosecutor was expecting. In any event, the record contains no evidence to support Mr. Garriott's assertion on appeal, which of course differs from his assertion below, that the prosecutor intentionally elicited the improper testimony by Mr. Fry. We thus find no error in the district court's denial of Mr. Garriott's motion to dismiss.

### III. Improper Opinion of Guilt Testimony

[¶60] In his final assertion of error, Mr. Garriott contends the district court committed plain error when it allowed the following testimony by DCI Task Force Officer Chase Nash during Mr. Garriott's cross-examination:

Q. ... Did you ever have any factual evidence on me?

A. Yes.

Q. Where—where is that factual evidence?

A. The factual evidence we heard from our witnesses earlier about the detailed you purchasing and acquiring methamphetamine from Pauline Hemicker in which you redistributed it to both John Fry and Angela Danielson. Not only that, when Pauling Hemicker was set to do a drug run to Cheyenne, Wyoming, she specifically asked you to change the tires. That in and of itself constitutes an agreement to commit a crime between two people, which is a conspiracy.

Q. So because I changed her tires, I'm being charged with conspiracy?

A. With the knowledge that she was going on a drug run.

Q. And did we ever prove that knowledge?

A. Ms. Hemicker testified to it under oath.

[¶61] Mr. Garriott contends this testimony was plain error because it invaded the province of the jury by offering an unsolicited opinion that Mr. Garriott is guilty of the crime of conspiracy. We disagree.

[¶62] "The law is clear that it is the jury's role to determine the guilt of the accused and a witness may not express an opinion as to his guilt." *Fennell*, ¶ 24, 350 P.3d at 719 (citing multiple cases). We have also recognized, however, that a party "may open the door to otherwise inadmissible testimony when he inquires about a particular subject." *Singer v. Lajaunie*, 2014 WY 159, ¶ 37, 339 P.3d 277, 287 (Wyo. 2014) (quoting *Roden v. State*, 2010 WY 11, ¶ 14, 225 P.3d 497, 501 (Wyo. 2010)). We have described the opening-the-door rule:

Succinctly stated, the "opening the door" rule is that a party who in some way permits the trial judge to let down the

gates to a field of inquiry that is not competent but relevant cannot complain if his adversary is also allowed to avail himself of the opening within its scope.

*Roden*, ¶ 14, 225 P.3d at 501 (quoting *Sanville v. State*, 593 P.2d 1340, 1344 (Wyo. 1979)).

[¶63] Shortly before the above quoted testimony by Officer Nash, Mr. Garriott asked for and elicited the following opinion testimony:

Q. The question is, you—you just stated you spent a lot of time and effort. So the question would be why would you—why would you guesstimate and make assumptions of what the real cause is when the case—why would you guess on—on facts when you're preparing your reports?

A. Okay. So if I—I just want to make sure I understand the question. You're—you're asking me why I would prepare an affidavit and charge you with conspiracy to deliver methamphetamine?

Q. That's not the question.

A. Okay. Yeah. I don't understand the question then.

Q. The question is: Why would you make assumptions when you're doing your supplemental reports? Why would you—why would you not tell the facts?

A. Okay. I did state the facts in my report.

Q. So the facts are that I was part of this conspiracy?

A. Do you want my opinion?

Q. Absolutely.

A. Absolutely. I absolutely think you're a drug dealer. I absolutely think that. No doubt about it.

Q. You absolutely do?

A. Yes, I do.

[¶64] By asking Officer Nash to provide an opinion as to whether he was guilty of the charged crime of conspiracy to deliver, Mr. Garriott opened the door to what would have otherwise been inadmissible opinion testimony. Officer Nash simply further availed himself of that opening when he further opined that changing the tires on Ms. Hemicker's vehicle, with knowledge the vehicle was to be used on a drug run, was evidence that Mr.

committed the crime of conspiracy. Because Mr. Garriott opened the door to this type of opinion evidence, we find no error in Officer Nash's testimony.[9]

## CONCLUSION

[¶65] The district court did not abuse its discretion or commit plain error in admitting the challenged testimony into evidence. We also find no error in the district court's denial of Mr. Garriott's motion to dismiss on Fifth Amendment double jeopardy grounds. Affirmed.

---

9. Even if we were to apply a plain error analysis, rather than the opening-the-door rule, our conclusion would be the same. While Officer Nash's testimony that Mr. Garriott was guilty of the crime of conspiracy may have crossed a line into impermissible opinion testimony, we would have to conclude the error was harmless. The co-conspirator testimony, which was confirmed by Mr. Garriott's own text messages, overwhelmingly established Mr. Garriott's participation in the conspiracy to deliver methamphetamine. Moreover, the record also contained Officer Nash's earlier opinion testimony that Mr. Garriott was guilty of the drug dealing and conspiracy—testimony elicited by Mr. Garriott and not challenged on appeal.